RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0121p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MICHIGAN CATHOLIC CONFERENCE and CATHOLIC FAMILY SERVICES D/B/A CATHOLIC CHARITIES DIOCESE OF KALAMAZOO (13-2723); THE CATHOLIC DIOCESE OF NASHVILLE, CATHOLIC CHARITIES OF TENNESSEE, INC., CAMP MARYMOUNT, INC., MARY, QUEEN OF ANGELS, INC., ST. MARY VILLA, INC., DOMINICAN SISTERS OF ST. CECILIA CONGREGATION, and AQUINAS COLLEGE (13-6640),

        *Plaintiffs-Appellants*,

    *v.*

SYLVIA MATTHEWS BURWELL, Secretary of the United States Department of Health and Human Services; THOMAS E. PEREZ, Secretary of the United States Department of Labor; JACOB J. LEW, Secretary of the United States Department of Treasury; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES DEPARTMENT OF LABOR; and UNITED STATES DEPARTMENT OF THE TREASURY,

        *Defendants-Appellees*.

Nos. 13-2723/6640

Appeal from the United States District Court for the
Western District of Michigan at Grand Rapids;
No. 1:13-cv-01247—Gordon J. Quist, District Judge.

and

Appeal from the United States District Court for the
Middle District of Tennessee at Nashville;
No. 3:13-cv-01303—Todd J. Campbell, District Judge.

Argued:  May 8, 2014

Decided and Filed:  June 11, 2014

Before:  MOORE and ROGERS, Circuit Judges; NIXON, District Judge.[*]

_____

**COUNSEL**

_____

**ARGUED:**  Matthew A. Kairis, JONES DAY, Columbus, Ohio, for Appellants.  Adam C. Jed, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.  **ON BRIEF:**  Matthew A. Kairis, Melissa Dunlap Palmisciano, Neil Vakharia, JONES DAY, Columbus, Ohio, for Appellants.  Adam C. Jed, Mark B. Stern, Alisa B. Klein, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.  Charles E. Davidow, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Washington, D.C., Daniel Mach, Brigitte Amiri, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, Washington, D.C., Ayesha N. Khan, AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, Washington, D.C., B. Eric Restuccia, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Amici Curiae.

_____

**OPINION**

_____

KAREN NELSON MOORE, Circuit Judge.  The plaintiffs-appellants in this consolidated appeal are non-profit entities affiliated with the Catholic Church who have religious objections to certain preventive care standards under the Patient Protection and Affordable Care Act.  Specifically, the appellants object to the requirement that their employer-based health insurance plans cover all Food and Drug Administration-approved contraception, sterilization methods, and counseling.  All of the appellants are eligible for either an exemption from the requirement or an accommodation to the requirement, through which the entities will not pay for the contraceptive products and services and the coverage will be independently administered by an insurance issuer or third-party administrator.  Nonetheless, in their complaints filed in the District Courts for the Middle District of Tennessee and Western District of Michigan, the appellants alleged that the contraceptive-coverage requirement violated the Religious Freedom Restoration Act; the Free Speech, Free Exercise, and Establishment Clauses of the First Amendment; and the Administrative Procedure Act.  Both district courts denied the appellants' motions for a

_____

[*]The Honorable John T. Nixon, United States District Judge for the Middle District of Tennessee, sitting by designation.

preliminary injunction.  We AFFIRM the denials of preliminary injunctions to all appellants on all claims.

## I.  BACKGROUND

### A.  Factual Background

The appellants allege that they are Catholic entities that provide "spiritual, educational, social, and financial services to members of their communities, Catholic and non-Catholic alike." MCC R. 1 (MCC Compl. at ¶ 1) (Page ID #2); CDN R. 1 (CDN Compl. at ¶ 2) (Page ID #2).[1]

All appellants currently provide health plans to their employees.  Michigan Catholic Conference ("MCC") offers a self-insured group health plan that is "administered by separate third party administrators,[2] Blue Cross Blue Shield of Michigan and Express Scripts."  MCC R. 1 (Compl. at ¶ 41) (Page ID #13).  Catholic Charities of Kalamazoo is a "Covered Unit[]" whose employees may participate in the plan that MCC offers its employees.  MCC R. 1 (Compl. at ¶¶ 41, 50–51) (Page ID #13, 15).  The remaining appellants—the Catholic Diocese of Nashville ("CDN");[3] Catholic Charities of Tennessee, Inc. ("Catholic Charities of Tennessee"); Camp Marymount, Inc. ("Camp Marymount"); Mary, Queen of Angels, Inc. ("MQA"); St. Mary Villa, Inc. ("St. Mary Villa"); Aquinas College; and Dominican Sisters of St. Cecilia Congregation ("St. Cecilia Congregation")—offer fully-insured group health plans.[4]  CDN R. 1 (Compl. at ¶¶ 43, 61, 71, 79, 80, 107, 129) (Page ID #13, 17, 19, 20, 25, 30).

---

[1]MCC R. refers to documents in *Michigan Catholic Conference et al. v. Burwell et al.*, No. 13-2723, and CDN R. refers to documents in *Catholic Diocese of Nashville et al. v. Burwell et al.*, No. 13-6640.

[2]"A self-insured plan is one in which benefits are paid from contributions supplied by the employer without the assistance of outside insurance." 1A Steven Plitt, et al., *Couch on Insurance* § 10.1 n.1 (3d ed. 2013).  "An employer is said to have a 'self-insured' plan if [the employer] bears the financial risk of paying claims." Government Br. at 7 n.1.  Many companies that offer self-insured plans hire an insurance company or other outside entity, referred to as a third-party administrator, "to administer their plans, performing functions such as developing networks of providers, negotiating payment rates, and processing claims." *Id.*

[3]CDN offers its employees a choice including a preferred provider option ("PPO plan") and a high-deductible option.  CDN R. 1 (Compl. at ¶ 43) (Page ID #13).  The PPO plan meets the definition of a "grandfathered plan" under the ACA; thus, at this time, that plan is exempt from the contraceptive-coverage requirement.  CDN R. 1 (Compl. at ¶ 46) (Page ID #13).

[4]"An insured plan, also known as a fully insured plan, is one in which insurance is purchased from a regulated insurance company." 1A Steven Plitt, et al., *Couch on Insurance* § 10.1 n.1 (3d ed. 2013).

MCC, CDN, and St. Cecilia Congregation allege that they are eligible for the total exemption from the contraceptive-coverage requirement for "religious employers," meaning that their health plans need not provide contraceptive coverage. MCC R. 1 (Compl. at ¶ 9) (Page ID #4); CDN R. 1 (Compl. at ¶ 14) (Page ID #7). The remaining appellants allege that they are eligible for the accommodation for certain religiously affiliated non-profits. MCC R. 1 (Compl. at ¶ 11) (Page ID #5); CDN R. 1 (Compl. at ¶ 10) (Page ID #5).

### *Regulatory Background*

The enactment of the Patient Protection and Affordable Care Act ("ACA") in 2010 established new minimum standards requiring employer-based group health plans and health insurance issuers to cover certain services without cost-sharing through a deductible or other payment by the plan participant or beneficiary. 42 U.S.C. § 300gg-13. The term "group health plan" is broadly defined to include both insured group health plans and self-insured group health plans: "[t]he term 'group health plan' means an employee welfare benefit plan . . . to the extent that the plan provides medical care (as defined in paragraph (2)) and including items and services paid for as medical care) to employees or their dependents (as defined under the terms of the plan) directly or through insurance, reimbursement, or otherwise." 42 U.S.C. § 300gg-91(a)(1). Congressional hearings emphasized the importance of coverage without cost-sharing for women's specific healthcare needs because "women have different health needs than men, and these needs often generate additional costs." 155 Cong. Rec. 29049, 29070 (Dec. 2, 2009) (statement of Sen. Feinstein). "Women of childbearing age spent 68 percent more in out-of-pocket health care costs than men." *Id.* Additionally, the legislative debates recognized that medical costs disproportionately discourage women from seeking treatment: "[w]omen are more likely than men to neglect care or treatment because of cost." 155 Cong. Rec. S11985, S11987 (daily ed. Nov. 30. 2009) (statement of Sen. Mikulski). The enacted law thus required coverage for, "with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration." 42 U.S.C. § 300gg-13(a)(4); *see also* Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services under the Patient Protection and Affordable Care Act,

77 Fed. Reg. 8725-01, 8725 (Feb. 15, 2012) (to be codified at 29 C.F.R. pt. 2590; 45 C.F.R. pt. 147).

For assistance in developing the guidelines for covered "preventive care and screenings," *id.*, the Health Resources and Services Administration ("HRSA") asked the Institute of Medicine ("IOM") to bring together a committee to "conduct a review of effective preventive services to ensure women's health and well-being." IOM, *Clinical Preventive Services for Women: Closing the Gaps* (*"Closing the Gaps"*) (2011), 1.[5] "The Institute of Medicine was established in 1970 by the National Academy of Sciences to secure the services of eminent members of appropriate professions in the examination of policy matters pertaining to the health of the public." *Id.* at iv. The members of the Committee on Preventive Services for Women ("Committee") included "specialists in disease prevention, women's health issues, adolescent health issues, and evidence-based guidelines." *Id.* at 2. The Committee recommended preventive measures that "met the following criteria:

- The condition to be prevented affects a broad population;
- The condition to be prevented has a large potential impact on health and well-being; and
- The quality and strength of the evidence is supportive.

*Id.* at 8. The Committee made eight recommendations[6] for preventive services for women, including coverage for "the full range of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity." *Id.* at 10; *see also* 77 Fed. Reg. at 8725. This recommendation was based on the Committee's concern about the high rate of unintended pregnancy in the United States; forty-nine percent of pregnancies in 2001 "were unintended—defined as unwanted or mistimed at the time of conception," a rate much higher than comparable developed countries. *Closing the Gaps* at 102. The rate of unintended pregnancy "is more likely among women who are aged 18 to 24 years and unmarried, who have a low income, who are not high school graduates, and who are members of a racial or ethnic minority group." *Id.* The Committee

---

[5]The report may be read online for free at: http://www.iom.edu/Reports/2011/Clinical-Preventive-Services-for-Women-Closing-the-Gaps.aspx.

[6]One of the sixteen members of the Committee, Anthony Lo Sasso, dissented from the report.

concluded that contraceptive coverage would greatly decrease the risk of unwanted pregnancies, adverse pregnancy outcomes, and other negative health consequences, and significantly reduce women's medical costs. *Id.* at 102–07. The regulations promulgated by the agencies implementing the ACA required group health plans and insurance issuers offering group or individual health insurance coverage to provide coverage without cost-sharing for preventive care and screenings provided for in guidelines supported by the HRSA. *See* 26 C.F.R. § 54.9815-2713A (Tax); 29 C.F.R. § 2590.715-2713A (Labor); 45 C.F.R. § 147.131 (Health and Human Services).[7]

The regulations provide for a religious-employer exemption from the contraceptive-coverage requirement and an accommodation for certain non-profits that do not qualify for the exemption but that object to contraceptive coverage on religious grounds. The government first developed the religious-employer exemption, under which HRSA is authorized to "establish an exemption . . . with respect to a group health plan established or maintained by a religious employer (and health insurance coverage provided in connection with a group health plan established or maintained by a religious employer) with respect to any requirement to cover contraceptive services under such guidelines." 45 C.F.R. § 147.131(a). A "religious employer" is defined as "an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 45 C.F.R. § 147.131(a); *see* 26 U.S.C. §§ 6033(a)(3)(A)(i), (iii) (referring to "churches, their integrated auxiliaries, and conventions or associations of churches" and "the exclusively religious activities of any religious order.").

Based on objections that the religious-employer exemption as borrowed from the Tax Code was drawn too narrowly, the government developed a special accommodation for certain non-profits. The accommodation was intended to "meet two goals—providing contraceptive coverage without cost-sharing to individuals who want it and accommodating non-exempted, non-profit organizations' religious objections to covering contraceptive services." 77 Fed. Reg.

---

[7]The Department of Treasury, Department of Labor, and Department of Health and Human Services promulgated identical regulations regarding the framework. *See* 26 C.F.R. § 54.9815-2713A; 29 C.F.R. § 2590.715-2713A; 45 C.F.R. § 147.131. For the sake of simplicity, we cite only the Department of Labor regulations.

at 8727.  The final regulations permitted "eligible organization[s]" to obtain the accommodation if the organization "satisfies all of the following requirements:

> (1)     The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.
> (2)     The organization is organized and operates as a nonprofit entity.
> (3)     The organization holds itself out as a religious organization.
> (4)     The organization self-certifies, in a form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (b)(1) through (3) of this section, and makes such self-certification available for examination upon request[.]

45 C.F.R. § 147.131(b).

The process by which an organization obtains the exemption and the accommodation will be discussed as relevant to the appellants' claims.

**B.  Procedural History**

MCC and Catholic Charities of Kalamazoo (together, "MCC plaintiffs") filed suit in the District Court for the Western District of Michigan on November 14, 2013.  CDN, Catholic Charities of Tennessee, Camp Marymount, MQA, St. Mary Villa, St. Cecilia Congregation, and Aquinas College (together, "CDN plaintiffs") filed suit in the District Court for the Middle District of Tennessee on November 22, 2013.  Both sets of plaintiffs alleged that the contraceptive-coverage requirement violated the Religious Freedom Restoration Act; the Free Exercise, Free Speech, and Establishment Clauses of the First Amendment, and the Administrative Procedure Act.  In November 2013, the plaintiffs moved for preliminary injunctions in their respective district courts.  The District Court for the Western District of Michigan denied a preliminary injunction on all claims because the plaintiffs had not shown a likelihood of success on the merits of their claims.  *Michigan Catholic Conference v. Sebelius* No. 1:13-CV-1247, 2013 WL 6838707, at *13 (W.D. Mich. Dec. 27, 2013).  The District Court for the Middle District of Tennessee held that the plaintiffs waived their claims under the Administrative Procedure Act, and denied a preliminary injunction on all other claims because the plaintiffs had not shown a likelihood of success on the merits of their claims.  *Catholic*

*Diocese of Nashville v. Sebelius*, No. 3:13-01303, 2013 WL 6834375, at *4–10 (M.D. Tenn. Dec. 26, 2013).

The appellants now appeal the denials of their motions for a preliminary injunction.

## II. ANALYSIS

### A. Standard of Review

As we recently stated in a unanimous en banc decision, there are:

four factors [the district court] must balance when considering a motion for preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor. Whether the movant is likely to succeed on the merits is a question of law we review de novo. We review for abuse of discretion, however, the district court's ultimate determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief. This standard is deferential, but the court may reverse the district court if it improperly applied the governing law, used an erroneous legal standard, or relied upon clearly erroneous findings of fact.

*City of Pontiac Retired Emps. Ass'n v. Schimmel*, No. 12-2087, 2014 WL 1758913, at *2 (6th Cir. May 5, 2014) (en banc) (internal quotation marks and citations omitted). "The party seeking a preliminary injunction bears a burden of justifying such relief, including showing irreparable harm and likelihood of success." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012).

### B. Religious Freedom Restoration Act

The appellants argue that the contraceptive-coverage requirement violates the Religious Freedom Restoration Act ("RFRA") because it imposes a substantial burden on their exercise of religion by forcing them to provide, pay for, and/or facilitate access to insurance coverage for contraception, and the contraceptive-coverage requirement is not the least restrictive means to further a compelling government interest. Both district courts concluded that the contraceptive-coverage requirement does not impose a substantial burden on the exercise of religion because the plaintiffs were eligible for either the exemption or the accommodation from the requirement.

To analyze properly the appellants' claim under RFRA, we begin with the genesis of the law. In *Sherbert v. Verner*, 374 U.S. 398 (1963), the Court held that if a state law survived constitutional challenge, it would be "because any incidental burden on the free exercise of appellant's religion may be justified by a 'compelling state interest in the regulation of a subject within the State's constitutional power to regulate . . . ." *Id.* at 403 (quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963)). The Supreme Court rejected the compelling-interest test in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), stating that:

> The government's ability to enforce generally applicable prohibitions of socially harmful conduct, like its ability to carry out other aspects of public policy, cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development. To make an individual's obligation to obey such a law contingent upon the law's coincidence with his religious beliefs, except where the State's interest is compelling—permitting him, by virtue of his beliefs, to become a law unto himself—contradicts both constitutional tradition and common sense.

*Id.* at 884–85 (quotation marks and internal citations omitted). In "direct response" to *Employment Division v. Smith*, Congress enacted RFRA. *City of Boerne v. Flores*, 521 U.S. 507, 512 (1997). RFRA's stated purposes are:

> (1) to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and
> (2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

42 U.S.C. § 2000bb(b). Under RFRA, the government may not "substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the government demonstrates that application of the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." [8] 42 U.S.C. §§ 2000bb-1(a), (b).

---

[8] As a preliminary matter, we note two questions that have not been raised by the parties in this case and that, because we conclude that the contraceptive-coverage requirement does not violate RFRA, we need not address. First, whether the appellants, all of whom are non-profit corporations, are "persons" capable of the "exercise of religion" within the meaning of RFRA. Second, whether RFRA applies to a later-enacted statute. RFRA contains

We follow a two-step process for analyzing RFRA claims:

> First, the plaintiff must make out a *prima facie* case by establishing Article III standing and showing that the law in question would (1) substantially burden (2) a sincere (3) religious exercise. If the plaintiff makes out a *prima facie* case, it falls to the government to demonstrate[ ] that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest. The government carries the burdens of both production and persuasion when it seeks to justify a substantial burden on a sincere religious practice.

*Autocam Corp. v. Sebelius*, 730 F.3d 618, 625 (6th Cir. 2013) (internal quotation marks and citations omitted). "Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists." *Thomas v. Review Bd. of Indiana Emp't Sec. Div.*, 450 U.S. 707, 717–18 (1981). But a government action does not constitute a substantial burden on the exercise of religion even if "the challenged Government action would interfere significantly with private persons' ability to pursue spiritual fulfillment according to their own religious beliefs" if the governmental action does not coerce the individuals to violate their religious beliefs or deny them the "rights, benefits, and privileges enjoyed by other citizens." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 449 (1988).

---

an express-reference requirement providing that "[f]ederal statutory law adopted after November 16, 1993 is subject to this chapter unless such law explicitly excludes such application by reference to this chapter." 42 U.S.C. § 2000bb-3(b). Essentially, RFRA purports to bind all later Congresses unless they specifically reject the application of RFRA by the means specified by the earlier Congress that enacted RFRA. The Supreme Court has questioned the binding effect of express-reference requirements. *Marcello v. Bonds*, 349 U.S. 302, 310 (1955) (refusing "to require the Congress to employ magical passwords in order to effectuate an exemption from" a previously enacted statute). In *Dorsey v. United States*, the Court treated a savings statute with an express-reference requirement as:

> in effect a less demanding interpretive requirement. That is because statutes enacted by one Congress cannot bind a later Congress, which remains free to repeal the earlier statute, to exempt the current statute from the earlier statute, to modify the earlier statute, or to apply the earlier statute but as modified. And Congress remains free to express any such intention *either expressly or by implication as it chooses*.

--U.S.--, 132 S. Ct. 2321, 2331 (2012) (emphasis added) (citations omitted). *See also Lockhart v. United States*, 546 U.S. 142, 149–50 (2005) (Scalia, J., concurring) (identifying RFRA as a statute with an express-reference requirement and remarking that "it does no favor to the Members of Congress, and to those who assist in drafting their legislation, to keep secret the fact that such express-reference provisions are ineffective."). Thus, Congress may reject the application of RFRA to a later-enacted statute without explicitly stating that RFRA does not apply.

The exercise of religion that appellants argue is burdened by the contraceptive-coverage requirement is their "refus[al] to take certain actions in furtherance of a regulatory scheme to provide their employees with coverage for abortion-inducing products, contraceptives, sterilization, and related education and counseling." Appellant Br. at 26–27. The government does not dispute that the appellants' desire not to participate in the provision of contraception is a sincere religious belief.

The government does argue, however, that the contraceptive-coverage requirement does not impose a substantial burden on the appellants' exercise of religion. Because the appellants all concede that they are eligible for either the exemption or the accommodation, they need not actually participate in the contraceptive-coverage requirement. Government Br. at 18–19. The appellants respond that the exemption and accommodation do not alleviate the burden of the contraceptive-coverage requirement because the process to obtain the exemption or accommodation forces the appellants "to play an integral role in the delivery of objectionable products and services to their employees." Appellant Br. at 27–29.

First, we must address the appellants' argument that the court should defer to their conclusion that the exemption and accommodation arrangement forces them to provide, pay for, and/or facilitate access to contraceptive coverage. *See* Appellant Br. at 18–20 (describing the district court's conclusion that the contraceptive-coverage requirement imposes a burden on third parties, not the appellants, as a "foray into the theology behind Catholic precepts on contraception [that] was manifestly improper") (internal quotation marks omitted); Appellant Br. at 36 ("Whether the accommodation relieves Appellants of moral culpability for their actions (i.e., allows them to opt out) or makes them complicit in a grave moral wrong is a question of religious conscience for [Appellants] to decide.") (internal quotation marks omitted). Put another way, the appellants appear to ask the court to defer not only to their *belief* that requesting the exemption or the accommodation makes them complicit in sin, but also to defer to their understanding of how the regulatory measure *actually works*.

But as was recently explained, "there is nothing about RFRA or First Amendment jurisprudence that requires the Court to accept plaintiffs' characterization of the regulatory scheme on its face." *Roman Catholic Archbishop of Washington v. Sebelius*, --F. Supp. 2d--, No.

13-1441, 2013 WL 6729515, at *14 (D.D.C. Dec. 20, 2013), *injunction granted pending appeal*, No. 13-5371 (D.C. Cir. Dec. 31, 2013)).  Although we are in no position to determine the moral or theological consequences of appellants requesting the exemption or accommodation, we must determine the legal consequences.  Whether a government obligation substantially burdens the exercise of religion is a question of law, not a "question[] of fact, proven by the credibility of the claimant."  *Mahoney v. Doe*, 642 F.3d 1112, 1121 (D.C. Cir. 2011)).  We "accept[ ] as true the factual allegations that [appellants'] beliefs are sincere and of a religious nature—but not the legal conclusion, cast as a factual allegation, that [their] religious exercise is substantially burdened."  *Kaemmerling v. Lappin*, 553 F.3d 669, 679 (D.C Cir. 2008).  Thus, although we acknowledge that the appellants believe that the regulatory framework makes them complicit in the provision of contraception, we will independently determine what the regulatory provisions require and whether they impose a substantial burden on appellants' exercise of religion.

### 1.  Appellants Eligible for the Exemption

MCC, CDN, and St. Cecilia Congregation allege that they are eligible for the religious-employer exemption from the contraceptive-coverage requirement.  MCC R. 1 (Compl. at ¶ 9) (Page ID #4); CDN R. 1 (Compl. at ¶ 14) (Page ID #7).  The government agrees that these three appellants are "exempt from the contraceptive coverage requirement under 45 C.F.R. § 147.131(a)."  Government Br. at 9–10, 18; *see also* Government Br. at 13.  The appellants do not object to any specific act that they must engage in to obtain the exemption.  Indeed, the government states that these "[p]laintiffs are . . . already exempt from the requirement to provide contraceptive coverage."  Government Br. at 13.  Because both parties agree that MCC, CDN, and St. Cecilia Congregation are eligible for the exemption and because the appellants do not identify any particular action that they must take to obtain the exemption that burdens their exercise of religion, appellants have not demonstrated a strong likelihood of success on the merits of this claim.

### 2.  Appellants Eligible for the Accommodation

The contraceptive-coverage framework does not impose a burden on the exercise of religion by those remaining appellants who are eligible for the accommodation.  If an entity has an insured group health insurance plan, all that the entity must do to obtain the accommodation is

"furnish[] a copy of the self-certification . . . to each issuer that would otherwise provide such coverage in connection with the group health plan."[9]  29 C.F.R. § 2590.715-2713A(c)(1).  If an entity has a self-insured plan, such as Catholic Charities of Kalamazoo, all that the entity must do to obtain the accommodation is "[c]ontract with one or more third party administrators"[10] and "provide[] each third party administrator that will process claims for any contraceptive services[11] . . . with a copy of the self-certification."  29 C.F.R. § 2590.715-2713A(b)(1)(i), (ii).  That is the entirety of the conduct that the objecting organization must engage in to obtain the accommodation.

The appellants are not required to "provide" contraceptive coverage.  They are not required physically to distribute contraception to their employees upon request, and the eligible organization's health plan does not host the coverage.  Upon receipt of the self-certification form, the insurance issuer "must—(A) Expressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan."  29 C.F.R. § 2590.715-2713A(c)(2)(i)(A).  In the self-insured context, the self-certification form declares to the third-party administrator that "[t]he eligible organization will not act as the plan administrator or claims administrator with respect to claims for contraceptive services." 29 C.F.R.  § 2590.715-2713A(b)(1)(ii)(A).    Instead,  the  third-party  administrator  "shall  be responsible for . . . compliance with" the preventive care and screenings provided for in the HRSA guidelines.   29  C.F.R.  § 2510.3-16(b),  (b)(1)  (referencing  obligations  in  42  U.S.C. § 300gg-13 and 29 C.F.R. § 2590.715-2713A(b)(1)(ii)).  Thus, although the insurance issuer or third-party administrator will provide contraceptive coverage, the appellants will not.

---

[9]Nothing in the record indicates that any of the insurance issuers with which the appellants contract has refused to provide contraceptive coverage upon receipt of a self-certification form.

[10]Catholic Charities of Kalamazoo, the only appellant alleging that it is eligible for the accommodation and has a self-insured plan, already contracts with a third-party administrator.  This appellant participates in the MCC Plan, "which consists of self-funded medical and prescription benefits administered by separate third party administrators, Blue Cross Blue Shield of Michigan and Express Scripts, respectively."  MCC R. 1 (Compl. at ¶¶ 41, 50) (Page ID #13, 15).

[11]Nothing in the record indicates that Catholic Charities of Kalamazoo's third-party administrator has refused to provide contraceptive coverage upon receipt of a self-certification form.

The appellants are not required to "pay for" contraceptive coverage. When an insurance issuer receives the self-certification form, it "must . . . Provide separate payments for any contraceptive services." 29 C.F.R. § 2590.715-2713A(c)(2)(i)(B). The eligible organization's money will not fund the contraceptive coverage: "[t]he issuer must segregate premium revenue collected from the eligible organization from the monies used to provide payments for contraceptive services." 29 C.F.R. § 2590.715-2713A(c)(2)(ii). When a third-party administrator receives the self-certification form, it must "provide or arrange payments for contraceptive services" either by providing the payments itself or arranging for an issuer or another entity to provide the payments. 29 C.F.R. § 2590.715-2713A(b)(2)(i), (ii). In either situation, whoever is providing the payments may not "impose[] a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries." 29 C.F.R. § 2590.715-2713A(b)(2)(i), (ii); (c)(2)(ii). The accommodated entity does not even need to be the one to tell the employees about the contraceptive coverage. The regulations require the insurance issuer or third-party administrator to provide written notice to plan participants and beneficiaries "specify[ing] that the eligible organization does not administer or fund contraceptive benefits, but that the third party administrator or issuer, as applicable, provides separate payments for contraceptive services." 29 C.F.R. § 2590.715-2713A(d). Thus, although the insurance issuer or third-party administrator will pay for contraceptive coverage, the appellants will not.

Moreover, the appellants are not required to "facilitate access to" contraceptive coverage. The crux of the appellants' "facilitation" argument is that providing the self-certification form to the insurance issuer or third-party administrator "triggers" the provision of the contraceptive coverage to their employees. Appellant Br. at 9, 27–31. This argument rests on two assumptions that are, perhaps, two sides of the same coin: first, that the insurance issuer and third-party administrator could not provide the coverage *until* they receive a self-certification form and second, that the insurance issuer and third-party administrator then provide the coverage *because* they received the self-certification form.

Submitting the self-certification form to the insurance issuer or third-party administrator does not "trigger" contraceptive coverage; it is federal law that requires the insurance issuer or

the third-party administrator to provide this coverage.  The ACA requires "[a] group health plan[12] and a health insurance issuer offering group or individual health insurance coverage" to "provide coverage for . . . with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration."  42 U.S.C. §§ 300gg-13(a), (a)(4).  Thus, under the ACA, the appellants' health plans and insurance issuers must provide contraceptive coverage without cost-sharing, whether or not the appellants decide to self-certify.  "Federal law, not the religious organization's signing and mailing the form, requires health-care insurers, along with third-party administrators of self-insured health plans, to cover contraceptive services."  *Univ. of Notre Dame*, 743 F.3d at 554.  "Because Congress has imposed an independent obligation on insurers to provide contraceptive coverage to Appellants' employees, those employees will receive contraceptive coverage from their insurers *even if* Appellants self-certify—but not *because* Appellants self-certify."  *Roman Catholic Archbishop of Washington v. Sebelius*, No. 13-5371; *Priests for Life v. U.S. Dep't of Health and Human Servs.*, No. 13-5368 (D.C. Cir. Dec. 31, 2013) (Tatel, J., dissenting from injunction pending appeal).  The obligation to cover contraception will not be triggered by the act of self-certification—it already was triggered by the enactment of the ACA.

The appellants allege that providing, paying for, and/or facilitating access to contraceptive coverage burdens their exercise of religion.  As discussed *supra*, the exemption and accommodation framework does not require them to do any of these things.  The framework does not permit them to prevent their insurance issuer or third-party administrator from providing contraceptive coverage to their employees pursuant to independent obligations under federal law.  However, the inability to "restrain the behavior of a third party that conflicts with the [appellants'] religious beliefs," *Michigan Catholic Conference*, 2013 WL 6838707, at *7, does not impose a burden on the appellants' exercise of religion.  "[W]hile a religious institution has broad immunity from being required to engage in acts that violate the tenets of its faith, it has

---

[12]Group health plan is broadly defined and includes both insured group health plans and self-insured group health plans:  "[t]he term 'group health plan' means an employee welfare benefit plan . . . to the extent that the plan provides medical care (as defined in paragraph (2)) and including items and services paid for as medical care) to employees or their dependents (as defined under the terms of the plan) directly or through insurance, reimbursement, or otherwise."  42 U.S.C. § 300gg-91(a)(1).

no right to prevent other institutions, whether the government or a health insurance company, from engaging in acts that merely offend the institution." *Univ. of Notre Dame*, 743 F.3d at 552.

The government's imposition of an independent obligation on a third party does not impose a substantial burden on the appellants' exercise of religion. In *Bowen v. Roy*, a pre-*Smith* Free Exercise case, the Supreme Court rejected a Free Exercise claim against the government's use of a Native American child's Social Security number. The father of the child "believe[d] the use of the number may harm his daughter's spirit." 476 U.S. 693, 699 (1986). The Court concluded that the Free Exercise Clause did not allow an individual to force the Government to conform its conduct to the individual's religious beliefs. "Never to our knowledge has the Court interpreted the First Amendment to require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development or that of his or her family." *Id.* The family "may not demand that the Government join in their chosen religious practices . . . . As a result, Roy may no more prevail on his religious objection to the Government's use of a Social Security number for his daughter than he could on a sincere religious objection to the size or color of the Government's filing cabinets." *Id.* at 700. Just as the government's use of the child's Social Security number "does not itself in any degree impair [the family's] 'freedom to believe, express, and exercise[e]' [their] religion," *id.*, the Government's instruction to insurance issuers and third-party administrators to provide contraceptive coverage does not force the appellants to provide, pay for, and/or facilitate access to the coverage.

Similarly, in *Kaemmerling v. Lappin* the D.C. Circuit rejected a RFRA claim because the challenged government action did not require anything of the challenger. A prisoner expressed religious objections to the government collecting and analyzing his DNA profile pursuant to the DNA Act. 553 F.3d 669, 678–79 (D.C. Cir. 2008). The court held that the prisoner "cannot identify any 'exercise' which is the subject of the burden to which he objects" because the governmental process of extracting DNA "involves no action or forbearance on [the prisoner's] part, nor does it otherwise interfere with any religious act in which he engages." *Id.* at 679. Here, the only thing that the exemption and accommodation framework requires of the appellants is conduct in which they already engage. They will continue to sponsor health plans, contract with insurance issuers or third-party administrators, and declare their opposition to providing

contraceptive coverage to their insurance issuer and third-party administrator. *Michigan Catholic Conference*, 2013 WL 6838707, at *7. The only difference in conduct is on the part of the insurance issuer or third-party administrator; appellants "are not required to 'modify [their] behavior.' Rather, it is the TPA [or insurance issuer] that is required to modify *its* behavior and take action by providing contraceptive services—without the assistance of" the appellant. *Id.* Employees and beneficiaries will receive contraceptive coverage, but that coverage will be "despite plaintiffs' religious objections, not because of them." Government Br. at 26. Again, the insurance issuers and third-party administrators are not parties to this suit and have not expressed any opposition to complying with the contraceptive-coverage requirement. The fact that the regulations require the insurance issuers and third-party administrators to modify their behavior does not demonstrate a substantial burden on the appellants.

In addition to the objection to the self-certification form, the appellants raise various procedural objections to the accommodation framework, none of which is meritorious. The appellants object to having to offer enrollment paperwork to allow employees to enroll in the plan overseen by the third party and to sending health-plan enrollment paperwork to the third party. Appellant Br. at 29. The regulations do not require either of these acts; the regulations specifically provide that the third-party administrator or insurance issuer (not the accommodated eligible organization) notifies plan participants and beneficiaries of the availability of payments for contraceptive services. *See* 29 C.F.R. §§ 2590.715-2713A(d). The appellants object to having to "[i]dentify for a third party which of their employees will participate in the plan." Appellant Br. at 29. Again, this is not required by the regulations. Moreover, because these appellants already contract with insurance issuers and third-party administrators, the insurance issuers and third-party administrators presumably already have lists of plan participants and beneficiaries. Finally, the appellants object to having to "[r]efrain from canceling their insurance arrangement with a third party authorized to provide the objectionable products and services." Appellant Br. at 29. Once again, the regulations do not prohibit the appellants from canceling an insurance arrangement, and the appellants have not expressed any actual intent to do so. Because these objections do not go to actual requirements of the contraceptive-coverage framework, they clearly do not demonstrate a substantial burden on appellants' exercise of religion.

The appellants argue that the exemption and accommodation mechanism pressures them to modify their behavior and violate their religious beliefs because previously they informed their insurance issuer or third-party administrator of their opposition to contraception and those entities did *not* cover contraception, but now they will inform their insurance issuer or third-party administrator of their opposition and those entities *will* cover contraception. But that is an objection to the later independent action of a third party, not to an obligation imposed on the appellants by the government. It is not the act of self-certification that causes the insurance issuer and the third-party administrator to cover contraception, it is the law of the United States that does that. Self-certification allows the eligible organization to tell the insurance issuer and third-party administrator "'we're excused from the new federal obligation relating to contraception,' and in turn, the government tells those insurance companies, 'but you're not.'" *Univ. of Notre Dame*, 743 F.3d at 557. Perhaps the appellants would like to retain the authority to prevent their insurance issuer or third-party administrator from providing contraceptive coverage to appellants' employees, but "RFRA is not a mechanism to advance a generalized objection to a governmental policy choice, even if it is one sincerely based upon religion." *Roman Catholic Archbishop of Washington*, 2013 WL 6729515, at *2.

Because these appellants may obtain the accommodation from the contraceptive-coverage requirement without providing, paying for, and/or facilitating access to contraception, the contraceptive-coverage requirement does not impose a substantial burden on these appellants' exercise of religion. Therefore, these appellants have not demonstrated a strong likelihood of success on the merits of their RFRA claim.

## C. First Amendment

### 1. Free Speech Clause

"It is . . . a basic First Amendment principle that freedom of speech prohibits the government from telling people what they must say." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, --U.S.--, 133 S. Ct. 2321, 2327 (2013) (internal quotation marks omitted). "The government may not prohibit the dissemination of ideas that it disfavors, nor compel the endorsement of ideas that it approves." *Knox v. Serv. Emps. Int'l Union, Local 1000*, --U.S.--, 132 S. Ct. 2277, 2288 (2012). The appellants argue that the contraceptive-coverage requirement

violates the Free Speech Clause of the First Amendment by forcing them to provide, pay for, and/or facilitate access to contraception counseling; forcing them to speak against their beliefs by filling out the self-certification form; and imposing a "gag order" by prohibiting them from interfering with or seeking to influence a third-party administrator's decision to cover contraception. We conclude that the contraceptive coverage requirement does not violate the Free Speech Clause of the First Amendment, and will address each of the subclaims in turn.

### a. Contraceptive counseling

First, the appellants argue that the contraceptive-coverage requirement unconstitutionally compels speech by forcing them to provide, pay for, and/or facilitate access to counseling about contraception, and that this obligation violates their religious opposition "to providing any support for 'counseling' that encourages, promotes, or facilitates such practices." Appellant Br. at 57–58. The guidelines recommended coverage without cost-sharing for "the full range of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity." *Closing the Gaps* at 10; *see also* 77 Fed. Reg. at 8725. Presumably, this counseling would include discussion of the range of contraceptive options, how the various products work, and what may be a good fit for the counseled individual's health profile and lifestyle.

The regulations certainly do not require the accommodated entity to "provide" this counseling. The accommodated entity need not discuss or acknowledge the existence of the counseling coverage; the regulations require the insurance issuer or third-party administrator to inform plan participants and beneficiaries that separate payments are available for counseling and other contraceptive services. *See* 29 C.F.R. §§ 2590.715-2713A(d). The regulations make no attempt to stop the appellants' practice of "counsel[ing] men and women against" using contraception. Appellant Br. at 57, 58. *See Rumsfeld v. Forum for Academic and Institutional Rights, Inc. ("FAIR")*, 547 U.S. 47, 65 (2006) (upholding a statute against a free-exercise challenge; the statute required law schools to give military recruiters equal access to other recruiters as a condition on receipt of certain federal funds, but "[n]othing about recruiting suggests that law schools agree with any speech by recruiters, and nothing in the Solomon Amendment restricts what the law schools may say about the military's policies."). Thus, in no

way do the regulations compel the appellants' speech by forcing them to provide contraceptive counseling.

The regulations also do not compel the appellants' speech by forcing them to pay for contraceptive counseling. As discussed *supra*, the regulations specifically prohibit an insurance issuer or third-party administrator from passing on the cost of complying with the contraceptive-coverage requirement, which includes the cost of contraceptive counseling. *See* 29 C.F.R. § 2590.715-2713A(b)(2), (c)(2).

Finally, the requirements do not force the appellants to facilitate access to contraceptive counseling. It is not clear what speech, exactly, the appellants believe is compelled by the facilitation of such coverage; in any event, as discussed *supra*, it is federal law, not the appellants' actions, that requires their insurance issuer or third-party administrator to provide insurance coverage for contraceptive counseling. The contraceptive coverage is provided through a government regulation of the insurance issuer and third-party administrator, not through the appellants' health insurance plan. *See* 29 C.F.R. § 2590.715-2713A(c)(2)(i)(A) (upon receipt of the self-certification form, the insurance issuer "must—(A) Expressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan"); 29 C.F.R. § 2590.715-2713A(b)(1)(ii)(A) (the self-certification form declares to the third-party administrator that "[t]he eligible organization will not act as the plan administrator or claims administrator with respect to claims for contraceptive services"). Thus, the framework does not require appellants to "host or accommodate another speaker's message" through their insurance plan. *FAIR*, 547 U.S. at 63; *cf. Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557, 566 (1995) (requiring a parade organizer to allow a group whose message it opposes to participate in the parade is unconstitutional forced accommodation of speech); *Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.*, 475 U.S. 1, 20–21 (1986) (plurality opinion) (forcing a utility company to include a third-party organization's newsletter with the utility bill is unconstitutional forced accommodation of speech).

The contraceptive counseling provision does not violate the Free Speech Clause of the First Amendment. Thus, appellants have not demonstrated a strong likelihood of success on the merits of this claim.

### b. Self-certification Form

Second, the appellants argue that the requirement that they complete the self-certification form in order to obtain the accommodation "compels Appellants to engage in speech that triggers provision of the objectionable products and services, and [ ] deprives Appellants of the freedom to speak on the issue of abortion and contraception on their own terms, at a time and place of their own choosing, outside of the confines of the Government's regulatory scheme." Appellant Br. at 58. As discussed *supra*, the self-certification form does not trigger the provision of contraceptive coverage, but instead it triggers the entities' *disassociation* from what they deem to be the objectionable coverage. Thus, this framework is nothing like the unconstitutional state campaign finance law in *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, where the state provided matching funds for publicly financed candidates when a privately financed candidate or independent expenditure group spent over a certain amount on the election, thus making the privately financed candidate's political expenditures a trigger of funding to his or her adversary. --U.S.--, 131 S. Ct. 2806, 2818 (2011). The self-certification form does not have a similar triggering function. Additionally, the self-certification form does not deprive appellants of the freedom to speak out about abortion and contraception on their own terms. The form requires the appellants to assert their opposition to contraception in order to opt out of a generally applicable government program. Successful compelled-speech cases are those when "an individual is obliged personally to express a message he disagrees with, imposed by the government." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 557 (2005). Even assuming that the government is compelling this speech, it is not speech that the appellants disagree with and so cannot be the basis of a First Amendment claim. Thus, the self-certification requirement does not compel speech in violation of the First Amendment, and so the appellants have not demonstrated a strong likelihood of success on the merits of this claim.

### c. "Gag Order"

Finally, the appellants argue that the accommodation framework imposes an unconstitutional "gag order" by prohibiting eligible organizations with self-insured group plans from interfering with, or seeking to influence, a third-party administrator's decision to provide contraceptive coverage. Specifically, the regulation provides:

> The eligible organization must not, directly or indirectly, seek to interfere with a third party administrator's arrangements to provide or arrange separate payments for contraceptive services for participants or beneficiaries, and must not, directly or indirectly, seek to influence the third party administrator's decision to make any such arrangements.

29 C.F.R. § 2590.715-2713A(b)(iii). A footnote in the commentary to the regulations states that "[n]othing in these final regulations prohibits an eligible organization from expressing its opposition to the use of contraceptives." Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. 39870, 39880 n.41 (July 2, 2013) (to be codified at 29 C.F.R. § 2510, 2590; 45 C.F.R. § 147, 156). The regulations thus draw a line between impermissible efforts to interfere with or influence a third-party administrator's provision of contraceptive coverage and permissible expressions of opposition to contraceptives.

The appellants have presented their objections to this regulation at a very high level of generality and fail to identify what protected speech this regulation chills.[13] It is not clear what the appellants want to do or say that they believe this regulation prohibits. Do the appellants feel chilled from having a calm discussion with their third-party administrator about Catholic doctrine, discouraging third-party administrators from entering into or maintaining contractual relationships with religiously affiliated organizations, encouraging the insurance issuer to violate federal law and refuse to provide contraceptive coverage, or something else altogether? We do

---

[13]Only the MCC plaintiffs raised this claim in their complaint, where they allege that contraceptive-coverage requirement "impos[es] a gag order that prohibits Plaintiffs from speaking out in any way that might 'influence,' 'directly or indirectly,' the decision of a third party administrator to provide or procure contraceptive products and services to Plaintiffs' employees." MCC R. 1 (Compl. at ¶ 188) (Page ID #44–45). In their motion for a preliminary injunction in the district court, they repeated this general argument and asserted that "[p]laintiffs believe that contraception is immoral, and by expressing that conviction they routinely seek to 'influence' or persuade their fellow citizens of that view." MCC R. 15 (Prelim. Inj. Memo at 38) (Page ID #639). In their brief to this court, the appellants make a brief, general argument that they "believe that contraception is contrary to their faith, and speak and act accordingly. The Government has no authority to outlaw such expression." Appellant Br. at 55.

not know.  Not all speech is protected by the First Amendment; for example, "an employer is free to communicate to his employees any of his general views about unionism" but may not make "a 'threat of reprisal or force or promise of benefit." *N.L.R.B. v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969).  Given the failure to "[tell] us what [they] want[] to say but fear[] to say" and the fact that "the government hasn't clearly embraced an interpretation of the regulation that would give rise to the [First Amendment] concerns," *Univ. of Notre Dame*, 743 F.3d at 561, the appellants have not demonstrated a strong likelihood of success on the merits of this claim.

### 2. Free Exercise Clause

The Free Exercise Clause is not violated by neutral laws of general applicability, "even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah ("Church of the L.B.A."),* 508 U.S. 520, 531 (1993). A law that is not neutral and of general applicability still does not violate the Free Exercise Clause if the law is "justified by a compelling governmental interest" and "narrowly tailored to advance that interest." *Id.* at 531–32.  The appellants argue that the contraceptive-coverage requirement is not a neutral law of general applicability because they say it was targeted at Catholic entities and has many exemptions.  Appellant Br. at 53–54.  On the contrary, the contraceptive-coverage requirement is a neutral law of general applicability and does not violate the Free Exercise Clause.

A law is not neutral "if the object of a law is to infringe upon or restrict practices because of their religious motivation." *Church of the L.B.A.*, 508 U.S. at 533.  "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernible from the language or context." *Id.*  However, "[f]acial neutrality is not determinative . . . 'The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders.'" *Id.* at 534 (quoting *Walz v. Tax Comm'n of New York City*, 397 U.S. 664, 696 (1970) (Harlan, J., concurring)).  The contraceptive-coverage requirement is a neutral law.  Neither the text nor the history of the statute and regulations promulgated pursuant to the statute demonstrate that the requirement was targeted at a particular religious practice.  There is no evidence that Congress and the executive branch agencies "had as their object the suppression of religion." *Id.* at 542.  The record does not "disclose[] animosity" towards the Catholic

practice of refusing to support access to contraception, the framework does not "by [its] own terms target this religious exercise," the program was not "gerrymandered with care to proscribe" the Catholic exercise of religion with respect to contraception but not secular opposition to contraception; and the arrangement does not "suppress much more religious conduct than is necessary in order to achieve the legitimate ends asserted in their defense." *Id.* at 542. The appellants argue that the Government was aware of the refusal of Catholic employers to provide contraceptive coverage and enacted the requirement to force Catholic employers to violate their religious beliefs. Appellant Br. at 54. This argument is unpersuasive; the fact that the Government has required a religiously affiliated entity to do something that it does not want to on the basis of religion does not, *ipso facto*, mean that the law was targeted at religious practice. Accordingly, the framework is neutral.

A law is not of general applicability if it "in a selective manner impose[s] burdens only on conduct motivated by religious belief," *Church of the L.B.A.*, 508 U.S. at 543. The appellants argue that the requirement is not generally applicable because grandfathered plans, small businesses, and religious employers that obtain an exemption need not comply with the contraceptive-coverage requirement. This argument misunderstands the meaning of general applicability under our Free Exercise jurisprudence. "General applicability does not mean absolute universality." *See Olsen v. Mukasey*, 541 F.3d 827, 832 (8th Cir. 2008). A law need not apply to every person or business in America to be generally applicable. A law is generally applicable if it does not make distinctions based on religion. To determine this, we consider whether the "legislature decide[d] that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Church of the L.B.A.*, 508 U.S. at 542–43. The requirement at issue here does not pursue the governmental interest in contraceptive coverage only against entities with a religiously motivated objection to providing such coverage; that interest is pursued uniformly against all businesses that are not grandfathered and have more than fifty employees. This includes entities that have no objection to the requirement, entities that object for non-religious reasons such as general opposition to government dictating healthcare requirements, and entities that object to the requirement for religious reasons. *See, e.g., Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1134 (9th Cir. 2009) (holding a rule was generally applicable because "pharmacists who do not have a religious

objection to Plan B must comply with the rules to the same extent—no more and no less—than pharmacies and pharmacists who may have a religious objection to Plan B"). In fact, the availability of the exemption and the accommodation means that the law imposes a *lesser* burden on those who object for religious reasons because they do not have to pay for the coverage. Accordingly, the program is generally applicable.

Because the law requiring contraceptive coverage is neutral and generally applicable, it does not violate the Free Exercise Clause even if it incidentally burdens the exercise of religion. Thus, the appellants have not demonstrated a strong likelihood of success on the merits of this claim.

### 3. Establishment Clause

"Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. However, "[the Supreme] Court has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144–45 (1987). The appellants argue that allowing some entities with a religious mission to obtain the exemption and others to obtain only the accommodation violates the Establishment Clause because the distinction "favors some types of religious organizations and denominations over others" and creates an excessive entanglement between government and religion. Appellant Br. at 59. Because the law's distinction does not favor a certain denomination and does not cause excessive entanglement between government and religion, the framework does not violate the Establishment Clause.

"The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). "[N]o State can 'pass laws which aid one religion' or that 'prefer one religion over another.'" *Id.* at 246 (quoting *Everson v. Bd. of Educ.*, 330 U.S. 1, 15 (1947)). For a claim such as this based on the allegedly disparate treatment of religions, "the constitutional value at issue is 'neutrality.'" *Gillette v. United States*, 401 U.S. 437, 450 (1971). The line that the exemption and accommodation framework draws between eligibility for the exemption and for the accommodation is based on organizational form and purpose, not religious denomination. Such

a distinction does not violate the Establishment Clause. "[R]eligious employers, defined as in the cited regulation, have long enjoyed advantages (notably tax advantages) over other entities, 26 U.S.C. §§ 6033(a)(3)(A)(i), (iii), without these advantages being thought to violate the establishment clause." *Univ. of Notre Dame*, 743 F.3d at 560 (citing *Walz*, 397 U.S. at 672–73). The appellants' reliance on the Tenth Circuit's decision in *Colorado Christian University v. Weaver*, 534 F.3d 1245 (10th Cir. 2008), is misplaced. There, the Tenth Circuit held that a state law permitting scholarship funding for students attending religious schools only if the school was not "pervasively" sectarian violated the Establishment Clause. *Id.* at 1258–60. The law did not make distinctions based on organizational form, as here; the Colorado law violated the Establishment Clause because it discriminated based on the nature of religious belief and practice at the university. Accordingly, that case provides no support for the appellants' argument. The fact that all of the appellants are affiliated with the Catholic Church and some are eligible for the exemption while others are eligible for the accommodation demonstrates that the framework does not discriminate based on denomination. Because the exemption and accommodation arrangement distinguishes between entities based on organizational form, not denomination, it does not express an unconstitutional state preference on the basis of religion.

Further, the provisions do not excessively entangle government and religion. The regulations define a "religious employer" as "an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 45 C.F.R. § 147.131(a). The referenced sections of the Internal Revenue Code provide exceptions from certain tax-return filing requirements for "churches, their integrated auxiliaries, and conventions or associations of churches" and "the exclusively religious activities of any religious order." 26 U.S.C. § 6033(a)(3)(A)(i), (iii). The IRS considers numerous factors to determine if an entity is eligible for the exceptions in § 6033(a)(3)(A)(i), (iii). *See Am. Guidance Found., Inc. v. United States*, 490 F. Supp. 304, 306 (D.D.C. 1980). The appellants argue that "these factors favor some religious groups over others . . . on the basis of intrusive judgments regarding beliefs, practices, and organizational structures." Appellant Br. at 63–64. However, the government argues that the "qualification for the religious employer exemption does not require the government to make any determination,

whether as a result of the application of the non-exhaustive, non-binding list or otherwise." Government Br. at 54–55. Plaintiffs have not shown how this is not correct.

Because the exemption and accommodation provisions do not prefer a denomination or excessively entangle government in religious practice, they do not violate the Establishment Clause. Thus, the appellants have not demonstrated a strong likelihood of success on the merits of this claim.

**D. Administrative Procedure Act**

Finally, the MCC appellants[14] argue that the contraceptive-coverage requirement violates the Administrative Procedure Act (APA) because the requirement violates the Weldon Amendment and thus is "not in accordance with law," and because the IOM guidelines recommending that contraception be included as preventive care were not subject to notice-and-comment rulemaking requirements. We conclude that the appellants have not demonstrated a strong likelihood of success on the merits of the Weldon Amendment claim, and we decline to reach the notice-and-comment claim.

**1. Weldon Amendment**

The MCC appellants argue that the contraceptive-coverage requirement violates the Weldon Amendment and therefore is "not in accordance with law," as required by the APA. The APA provides that a "reviewing court shall . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Weldon Amendment is a rider to an appropriations bill that denies funding to federal agencies or programs "if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions."[15] Consolidated Appropriations Act of 2012, Pub. L. No. 112-74, div.

---

[14]Although the CDN plaintiffs included an APA claim in their complaint, that claim was not raised in the motion for a preliminary injunction, and so the district court correctly treated the claim as waived for purposes of the preliminary injunction. *Catholic Diocese of Nashville*, 2013 WL 6834375, at *10 n.13.

[15]It is not clear that any of the MCC appellants who properly raised this claim is an "institutional or individual health care entity" within the meaning of the Weldon Amendment. The Weldon Amendment defines

F, tit. V, § 507(d)(1), 125 Stat. 786, 1111 (2011). The district court held that the contraceptive-coverage requirement does not violate the Weldon Amendment because the FDA-approved emergency contraceptives are not defined as abortion-inducing products under federal law. The appellants argue that this analysis is in error because the court should defer to the plan provider's definition of "abortion" and the appellants believe that the "morning-after pill (Plan B) and Ulipristal (HRP 2000 or [e]lla)" are "abortion-inducing products." Appellant Br. at 65.

The appellants are correct that the Weldon Amendment does not define abortion. The appellants argue that the absence of a statutory definition means that the court should defer to their independent interpretation of "abortion." That is not how statutory interpretation works. Rather, the federal courts will utilize traditional methods of statutory interpretation to determine whether "abortion" in the Weldon Amendment includes FDA-approved emergency contraceptives.

The government notes that the FDA-approved labels for Plan B and ella describe these products as emergency contraceptives and do not mention abortion. *See* FDA-approved label for Plan B, available at http://www.accessdata.fda.gov/drugsatfda_docs/label/2009/021045s015lbl.pdf; FDA-approved label for ella http://www.accessdata.fda.gov/drugsatfda_docs/label/2012/022474s002lbl.pdf. The appellants do not identify any statutory or regulatory definition of abortion that includes

---

"[h]ealth care entity" as "an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan." Consolidated Appropriations Act of 2012, Pub. L. No. 112-74, div. F, tit. V, § 507(d)(2). The appellants allege that the Michigan Catholic Conference Second Amended and Restated Group Health Benefit Plan for Employees ("MCC Benefit Plan") is a health plan. MCC R. 1 (MCC Compl. at ¶ 16) (Page ID #7). However, it is not clear that the MCC Benefit Plan is an actual plaintiff in this case. The complaint is captioned "MICHIGAN CATHOLIC CONFERENCE in its own name and on behalf of the MICHIGAN CATHOLIC CONFERENCE SECOND AMENDED AND RESTATED GROUP HEALTH BENEFIT PLAN FOR EMPLOYEES . . . ." MCC R. 1 (MCC Compl. at 1) (Page ID #1). Although the complaint describes MCC and Catholic Charities as "plaintiff[s]," it does not describe the MCC Benefit Plan as a plaintiff. *See id.* at ¶¶ 16, 17 (Page ID #7). However, because we affirm the denial of the preliminary injunction on this claim, we need not decide this issue at this time.

We also question the appellants' assumption that MCC is discriminated against for refusing to provide contraceptive coverage. MCC concedes that it is eligible for the religious-employer exemption. MCC R. 1 (Compl. at ¶ 9) (Page ID #4). Consequently, its health insurance plan need not cover contraception or emergency contraception. Thus, it is not clear how MCC is discriminated against for refusing to provide contraceptive coverage. *See Roman Catholic Archbishop of Washington*, 2013 WL 6729515, at *46 (holding that the contraceptive-coverage requirement is consistent with the Weldon Amendment for entities that are eligible for the exemption or the accommodation).

emergency contraceptives.   Because the burden is on the appellants to demonstrate a strong likelihood of success on the merits, and the appellants have neither asserted nor argued nor presented evidence that the federal government classifies these drugs as abortifacients, they have not shown a strong likelihood of success on the merits of their claim.

**2.  Notice and Comment**

The appellants argue that the government violated the APA because it did not subject the IOM recommendation that preventive services include contraceptive coverage to notice and comment rulemaking pursuant to 5 U.S.C. § 553(b).  Appellant Br. 66–68.  This claim was not properly raised in or decided by the district court, so we decline to address it for the first time on appeal.

As discussed *supra*, the CDN plaintiffs did not raise any APA claims in their motion for a preliminary injunction.  The MCC plaintiffs' only reference to a notice-and-comment claim is a single sentence in the introduction section of their memorandum in support of the motion for a preliminary injunction:  "Finally, the Mandate violates the Administrative Procedure Act ('APA') because Defendants failed to conduct notice-and-comment rulemaking, and it contravenes the clear terms of the Weldon Amendment."  MCC R. 15 (Prelim. Inj. Memo. at 3) (Page ID #604).  In the argument section of the memorandum the MCC plaintiffs discussed the Weldon Amendment issue, but did not return to the notice-and-comment issue.  See *id.* at 44–45 (Page ID #645–46).  The district court did not address the notice-and-comment argument in its decision. *See Michigan Catholic Conference*, 2013 WL 6838707, at *13.

We generally do not consider issues raised for the first time on appeal.  *In re Cannon*, 277 F.3d 838, 848 (6th Cir. 2002).  "Factors guiding the determination of whether to consider an issue for the first time on appeal include:

> 1) whether the issue newly raised on appeal is a question of law, or whether it requires or necessitates a determination of facts; 2) whether the proper resolution of the new issue is clear and beyond doubt; 3) whether failure to take up the issue for the first time on appeal will result in a miscarriage of justice or a denial of substantial justice; and 4) the parties' right under our judicial system to have the issues in their suit considered by both a district judge and an appellate court.

*Id.* (internal quotation marks omitted).  Accordingly, we decline to exercise our discretion to address this claim.

**E.  Other Factors for Injunctive Relief**

We conclude that the appellants have not demonstrated a strong likelihood of success on the merits of any of their properly raised claims.  The other three factors that we consider in evaluating a request for a preliminary injunction are:  (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.  *City of Pontiac Retired Emps. Ass'n*, 2014 WL 1758913, at *2.  When the alleged injury is to a First Amendment freedom, as here, the strong likelihood of success on the merits factor merges with the irreparable injury factor.  "To the extent that [appellant] can establish a likelihood of success on the merits of its First Amendment claim, it also has established the possibility of irreparable harm as a result of the deprivation of the claimed free speech rights." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998).  Conversely, if appellant "does not have a likelihood of success on the merits . . . his argument that he is irreparably harmed by the deprivation of his First Amendment right also fails."  *McNeilly*, 684 F.3d at 615.  Because the appellants do not demonstrate a strong likelihood of success on the merits of their claims, they also do not demonstrate that they will suffer irreparable injury without the injunction.

The district courts did not abuse their discretion by denying preliminary injunctions.

**III.  CONCLUSION**

For the foregoing reasons, we **AFFIRM** the district courts' denial of preliminary injunctions.  We lift the stay temporarily issued by this court pending resolution of this appeal.