In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 13-3853

UNIVERSITY OF NOTRE DAME,

*Plaintiff-Appellant,*

*v.*

SYLVIA MATHEWS BURWELL, Secretary of U.S. Department of
  Health & Human Services, *et al.*,

*Defendants-Appellees,*

*and*

JANE DOE 3,

*Intervening Appellee.*

_____

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:13-cv-01276-PPS-CAN — **Philip P. Simon**, *Chief Judge*.

_____

ARGUED APRIL 22, 2015 — DECIDED MAY 19, 2015

_____

Before POSNER, FLAUM, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. The Affordable Care Act requires
providers of health insurance (including both health insur-
ance companies and companies that administer self-insured

employer health plans on behalf of the employer—such companies are called "third party administrators") to cover certain preventive services without cost to the insured, including, "with respect to women, such additional preventive care … as provided for in comprehensive guidelines supported by the Health Resources and Services Administration" of the Department of Health and Human Services. 42 U.S.C. § 300gg-13(a)(4); see also 45 C.F.R. § 147.130(a)(1)(iv); 76 Fed. Reg. 46621, 46623 (Aug. 3, 2011). Guidelines specifying such care have been promulgated by the Department and include, so far as bears on this case, "all Food and Drug Administration approved contraceptive methods." Health Resources & Services Administration, "Women's Preventive Services Guidelines," www.hrsa.gov/womensguidelines (visited May 14, 2015, as were the other websites cited in this opinion).

About half of all pregnancies in the United States are unintended, and 40 percent of them end in abortion and many others in premature births or other birth problems. Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps* 102–03 (2011), www.nap.edu/catalog.php?record_id= 13181; Lawrence B. Finer & Mia R. Zolna, "Shifts in Intended and Unintended Pregnancies in the United States, 2001–2008," 104 *Am. J. Pub. Health* S43, S44 (2014). Many of the unintended pregnancies are teen pregnancies, and contraceptive use has been found to be positively correlated with decreased teen pregnancy. John S. Santelli & Andrea J. Melnikas, "Teen Fertility in Transition: Recent and Historical Trends in the United States," 31 *Ann. Rev. Pub. Health* 371, 375–76, 379 (2010). Because out-of-pocket expenditures on female contraceptives can be substantial for many women, see Su-Ying Liang et al., "Women's Out-of-Pocket Expendi-

tures and Dispensing Patterns for Oral Contraceptive Pills Between 1996 and 2006," 83 *Contraception* 528, 531 (2011), the provision of such contraceptives without cost to the user can be expected to increase contraceptive use and so reduce the number both of unintended pregnancies and of abortions. See Jeffrey F. Peipert et al., "Preventing Unintended Pregnancies by Providing No-Cost Contraceptives," 120 *Obstetrics & Gynecology* 1291, 1295–96 (2012). Furthermore, "women who can successfully delay a first birth and plan the subsequent timing and spacing of their children are more likely than others to enter or stay in school and to have more opportunities for employment and for full social or political participation in their community." Susan A. Cohen, "The Broad Benefits of Investing in Sexual and Reproductive Health," 7 *Guttmacher Report on Public Policy*, March 2004, pp. 5, 6; see also Martha J. Bailey et al., "The Opt-in Revolution? Contraception and the Gender Gap in Wages," 4 *American Economic Journal: Applied Economics,* July 2012, pp. 251–52. For a compact and convincing summary of the benefits to society in general and women in particular of inexpensive access to contraception, see *Priests for Life v. U.S. Dept. of Health & Human Services*, 772 F.3d 229, 257–64 (D.C. Cir. 2014).

The University of Notre Dame provides health benefits to both its employees and its students. It self-insures its employees' medical expenses, but has hired Meritain Health, Inc. to administer the employee health plan without providing any insurance coverage; Meritain is therefore the third-party administrator of the university's employee health plan. To take care of its students' medical needs, Notre Dame has a contract with Aetna, Inc., the well-known health care and health insurance company (and Meritain's parent); the con-

tract gives the students the option of obtaining health insurance from Aetna at rates negotiated by Notre Dame. Meritain administers coverage for some 4600 employees of Notre Dame (out of a total of 5200) and 6400 dependents of employees. Aetna insures 2600 students and 100 dependents; Notre Dame has about 11,000 students, most of whom have coverage under either their parents' health insurance policies or under their own policies rather than under the Aetna Notre Dame Health Plan.

Because Catholic doctrine forbids the use of contraceptives to prevent pregnancy (the "rhythm" method of avoiding pregnancy, which is permitted, is a form of abstention, not of contraception), Notre Dame has never paid for contraceptives for its employees or permitted Aetna to insure students under the Aetna Notre Dame Health Plan (or any other Aetna plan) for the expense of contraceptives. Cognizant of the religious objections of Catholic and a number of other religious institutions to contraception, and mindful of the dictate of the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb-1(a), (b), that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless "it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest," some months after the enactment of the Affordable Care Act the government offered a religious exemption from the contraception guidelines. See "Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services," 76 Fed. Reg. 46621, 46626 (Aug. 3, 2011) (codified at 45 C.F.R. § 147.130(a)(1)(iv)); see also 77 Fed. Reg. 8725, 8727–29 (Feb. 15, 2012).

At first the exemption was limited to churches and so excluded religious institutions that are incorporated as non-profit (rather than as religious) institutions, such as Notre Dame. The exclusion precipitated the filing in 2012 of a federal suit by the university against the government, claiming that the contraceptive regulations infringed rights conferred on the university by both the First Amendment and the Religious Freedom Restoration Act. That suit was dismissed on standing and ripeness grounds, the government having promised that Notre Dame wouldn't have to comply with the regulations for one year, during which new regulations would be issued. *University of Notre Dame v. Sebelius*, 2012 WL 6756332, at *3–4 (N.D. Ind. Dec. 31, 2012); see "Certain Preventive Services Under the Affordable Care Act," 77 Fed. Reg. 16501, 16502–03 (Mar. 21, 2012). The new regulations were issued as promised—and as expected they enlarged the exemption. See "Coverage of Certain Preventive Services Under the Affordable Care Act," 78 Fed. Reg. 39870, 39875–90 (July 2, 2013); 29 C.F.R. § 2590.715-2713A(a); 45 C.F.R. § 147.131(b). As a result, Notre Dame now came within its scope.

But to exercise its right conferred by the new regulations to opt out of having to pay for contraceptive coverage either directly (with or without the administrative assistance of a third-party administrator, such as Meritain) or through a health insurer, such as Aetna, the university had to fill out "EBSA Form 700—Certification." See 45 C.F.R. § 147.131(b)(4). The form (www.dol.gov/ebsa/pdf/preventive serviceseligibleorganizationcertificationform.pdf) is short, its meat the following sentence: "I certify that, on account of religious objections, the organization opposes providing coverage for some or all of any contraceptive services that

would otherwise be required to be covered; the organization is organized and operates as a nonprofit entity; and the organization holds itself out as a religious organization." The form states that "the organization or its plan must provide a copy of this certification to the plan's health insurance issuer (for insured health plans) or a third party administrator (for self-insured health plans) in order for the plan to be accommodated with respect to the contraceptive coverage requirement." So Notre Dame, if it decided to sign the exemption form, would have to give copies to both Aetna and Meritain.

As noted at the outset of this opinion, the Affordable Care Act requires providers of health insurance (including third-party administrators of self-insured health plans, even though they are conduits rather than ultimate payors of plan benefits) to provide contraceptive coverage for women. See also 45 C.F.R. §§ 147.131(c)(2)(i)(B), (ii); 29 C.F.R. § 2590.715-2713A(b)(3). The exemption form if signed by Notre Dame and sent to Aetna and Meritain would therefore inform them that since Notre Dame was not going to pay for contraceptive coverage of its students and staff, Aetna and Meritain would have to pay. Aetna (including its Meritain subsidiary) has neither religious nor financial objections to paying for contraception. Regarding the cost to these companies, the government will reimburse at least 110 percent of the third-party administrator's (Meritain's) costs, 45 C.F.R. § 156.50(d)(3), while Aetna can expect to recoup its costs of contraceptive coverage from savings on pregnancy medical care (since there will be fewer pregnancies if contraception is more broadly available, at no cost, to Notre Dame's female employees and students) as well as from other regulatory

offsets. See "Coverage of Certain Preventive Services Under the Affordable Care Act," *supra*, 78 Fed. Reg. at 39877–78.

The regulations required Aetna and Meritain, if Notre Dame signed and sent the exemption form—but not Notre Dame—to inform the university's female employees and students that those companies would be covering their contraceptive costs. See 26 C.F.R. § 54.9815-2713A(d); 29 C.F.R. § 2590.715-2713A(d). The companies could either "provide payments for contraceptive services" themselves or, alternatively, "arrange for an insurer or other entity to provide payments for" those services, but they could not "impos[e] any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or impos[e] a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries." 29 C.F.R. §§ 2590.715-2713A(b)(2), (c)(2).

The regulations thus sought an accommodation between the secular interests that had motivated the requirement to provide contraceptive services to women free of charge and the interests of religious objectors. Accommodation is consistent with the balancing act required by the Religious Freedom Restoration Act, which as we noted requires consideration of "substantial burden" (on the institution unwilling to provide contraceptive services), a "compelling governmental interest" in that provision, and the "least restrictive means" that is feasible for realizing the government's interest.

When the accommodation was promulgated in July of 2013, Notre Dame did not at first bring a new suit (remember that its previous suit, brought when the university was

excluded from opting out of contraceptive coverage, had been dismissed on jurisdictional grounds, and those grounds were irrelevant to a suit challenging the new regulations). Not until December 2013 did the university file the present suit, challenging the accommodation. The delay in suing was awkward, since the regulations were to take effect with respect to the employee health plan—and did take effect—on January 1, 2014. "Coverage of Certain Preventive Services Under the Affordable Care Act," *supra*, 78 Fed. Reg. at 39889. (The student health plan, provided by Aetna, had until August 2014 to comply. See *id.*; University of Notre Dame, *2013–2014 Student Injury and Sickness Insurance Plan* 3, 5, http://uhs.nd.edu/assets/108455/nd_brochure_1314.pdf.)

With the January deadline for compliance looming, the university, less than a week after filing its second suit on December 3, 2014, asked the district court to issue a preliminary injunction that would prevent the government from enforcing the regulation against it pending a trial. The district judge denied the motion on December 20, and Notre Dame filed its appeal from that denial the same day. On December 30 we denied the university's emergency motion for an injunction pending appeal. The next day—the last day before it would be penalized for violating the regulations—the university signed EBSA Form 700 and thereby opted out of providing contraceptive coverage for its employees. On January 28 it filed with us a second appeal from the denial of the preliminary injunction that it had sought. Later it signed the same form regarding Aetna.

The lawsuit had been only a few weeks old when Notre Dame appealed, and so the district judge suspended all proceedings in his court pending our resolution of the appeal

(which as just noted had become two appeals). The parties had thus had only a slender window in which to present evidence, and very little had been presented. Because of Notre Dame's focus on obtaining relief at the appellate level, there has been no resumption of proceedings in the district court, and as a result there is very little evidence in the record before us. That is one reason why, in a decision issued on February 21, 2014, we declined (with one member of the panel dissenting) to reverse the district judge's denial of the preliminary injunction sought by Notre Dame. *University of Notre Dame v. Sebelius*, 743 F.3d 547 (7th Cir. 2014). A few months later, in an almost identical case, the Sixth Circuit also ruled in favor of the government, *Michigan Catholic Conference & Catholic Family Services v. Burwell*, 755 F.3d 372 (6th Cir. 2014), vacated and remanded, 2015 WL 1879768 (April 27, 2015), and afterward was joined by the D.C. Circuit in *Priests for Life v. U.S. Dept. of Health & Human Services*, *supra*.

Notre Dame continued filing appellate petitions, the most notable being a petition for certiorari, granted by the Supreme Court on March 9 of this year in an order (*University of Notre Dame v. Burwell*, 135 S. Ct. 1528) that states in its entirety: "On petition for writ of certiorari to the United States Court of Appeals for the Seventh Circuit. Petition for writ of certiorari granted. Judgment vacated, and case remanded to the United States Court of Appeals for the Seventh Circuit for further consideration in light of *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. ___, 134 S.Ct. 2751 (2014)." With the case now back in this court, the parties filed position statements, after which we heard oral argument for an hour and fifty minutes. The discussion of issues that follows in this opinion is based on the position statements and oral

argument, on portions of our original opinion, and on the *Hobby Lobby* decision.

Our previous opinion had expressed puzzlement about what exactly the university wanted us to enjoin. It had by that time signed EBSA Form 700 and sent copies to Aetna and Meritain, thus obtaining the statutory accommodation, and the companies had notified Notre Dame's employees and students that they (the companies, not the university) would be providing contraceptive coverage. We now have (we think) a clearer idea of what the university wants. It wants us to enjoin the government from forbidding Notre Dame to bar Aetna and Meritain from providing contraceptive coverage to any of the university's students or employees. Because of its contractual relations with the two companies, which continue to provide health insurance coverage and administration for medical services apart from contraception as a method of preventing pregnancy, Notre Dame claims to be complicit in the sin of contraception. It wants to dissolve that complicity by forbidding Aetna and Meritain—with both of which, to repeat, it continues to have contractual relations—to provide any contraceptive coverage to Notre Dame students or staff. The result would be that the students and staff currently lacking coverage other than from Aetna or Meritain would have to fend for themselves, seeking contraceptive coverage elsewhere in the health insurance market.

Notre Dame does not forbid its students or staff to use contraception or to obtain reimbursement from health insurance companies for their purchase of contraceptives. Its objection that it asks us to ratify by issuing a preliminary injunction is to Aetna's and Meritain's being legally obligated

to make contraceptive coverage available to Notre Dame students and staff. It regards its contractual relationship with those companies as making the university a conduit between the suppliers of the coverage and the university's students and employees. In the university's words, the contraception regulation imposes a substantial burden on it by forcing the university to "identify[] and contract[] with a third party willing to provide the very services Notre Dame deems objectionable."

But the scanty record contains no evidence to support the conduit theory. Although Notre Dame is the final arbiter of its religious beliefs, it is for the courts to determine whether the law actually forces Notre Dame to act in a way that would violate those beliefs. As far as we can determine from the very limited record, the only "conduit" is between the companies and Notre Dame students and staff; the university has stepped aside. Thus it tells its students (and we assume its staff as well) that "the University of Notre Dame honors the moral teachings of the Catholic Church. Therefore, for example, University Health Services may prescribe contraceptive medications to treat approved medical conditions, but not to prevent pregnancy. To comply with federal law, Aetna Student Health provides coverage for additional women's health products or procedures that the University objects to based on its religious beliefs. *This coverage is separate from Notre Dame.* Students enrolled in Aetna Student Health may call Aetna customer service at 877-378-9492 for more information. Students not covered by Aetna Student Health should check with their own insurance plans regarding federally-mandated women's health coverage." University of Notre Dame Health Services, "FAQ-Aetna Student Health," http://uhs.nd.edu/insurance-billing/faq-aetna-stude

nt-health-ans/ (emphasis added). There thus is no suggestion that Notre Dame is involved at all in Aetna's and Meritain's contraception coverage.

When the case was last before us, in 2014, the university's lawyer had similarly argued that Notre Dame's health plans were the "conduit" through which the employees and students obtained contraceptive coverage, making Notre Dame complicit in sin. But the lawyer also had said that his client would have no problem if each of its female employees signed and mailed to Meritain (and its students mailed to Aetna) a form saying "I have insurance through Notre Dame, but the university won't cover contraceptive services, so now you must cover them." It's difficult to see how that would make the health plan any less of a "conduit" between Notre Dame and Aetna/Meritain.

It's not even clear that by forcing Aetna/Meritain to provide Notre Dame's students and staff with contraception coverage the government is forcing Notre Dame to do business with an entity that is providing an objectionable service to the Notre Dame community. For the government authorizes a third-party administrator to "arrange for an issuer or other entity" to pay for contraception coverage and bill the expense to the government. 29 C.F.R. § 2590.715-2713A(b)(2)(ii). Notre Dame thus could ask Meritain to outsource contraception coverage for both students and staff to an entity that does no business with Notre Dame. The university would have no contractual relationship with that entity and so would not be involved even indirectly in the provision of contraceptive coverage to its students and employees.

A further problem with Notre Dame's quest for a preliminary injunction is the absence from the record of its contracts with Aetna and Meritain. We are not told what the duration of the contracts is, whether or in what circumstances they are terminable by Notre Dame before their expiration date, or what the financial consequences to the companies might be given that the federal government reimburses health insurers' contraception payouts generously. So far as contraception is concerned, health insurers are merely intermediaries between the federal government and the consumers. We are led in turn to wonder whether the government—which rarely provides health services directly to patients but rather uses health care companies to provide those services as the government's agents—might without offending Notre Dame's religious scruples hire Aetna and Meritain to provide that coverage. That would be simpler and more direct than the government's shopping for other health insurance companies to be its agents in dealing with Notre Dame's students and staff.

It is irregular, moreover, for a court to be asked to enjoin nonparties. For all we know, Aetna and its subsidiary value the opportunity to provide contraception coverage with generous reimbursement by the federal government. (The record, consistent with its sparseness, contains almost nothing about Aetna or Meritain.) Their business is providing health care, health care administration, and health insurance, and Notre Dame wants unilaterally to exclude them from a possibly lucrative chunk of that business. When the university, albeit under protest, signed and mailed the exemption form, Aetna and Meritain reasonably believed that they had an economic opportunity—that for the first time they would be providing contraceptive coverage to the Notre Dame

community. (Remember that before the Affordable Care Act was passed they provided no such coverage to the community.) They have had no opportunity to intervene in the district court, where proceedings have been suspended pending Notre Dame's appellate submissions culminating in this case.

Notre Dame takes particular umbrage at the regulation under the Affordable Care Act which states that "if the eligible organization provides a copy of the self-certification [EBSA Form 700] of its objection to administering or funding any contraceptive benefits … to a third party administrator [Meritain], the self-certification shall be an instrument under which the plan is operated, [and] shall be treated as a designation of the third party administrator as the plan administrator under section 3(16) of ERISA for any contraceptive services required to be covered under § 2590.715-2713(a)(1)(iv) of this chapter to which the eligible organization objects on religious grounds." 29 C.F.R. § 2510.3-16(b). (What a mouthful!) Notre Dame treats this regulation as having made its mailing of the certification form to its third-party administrator (Meritain) the *cause* of the provision of contraceptive services to its employees in violation of its religious beliefs. That's not correct. Since there is now a federal right, unquestioned by Notre Dame, to contraceptive services, the effect of the university's exercise of its religious exemption is to throw the entire burden of administration on the entities (Aetna and Meritain) that now provide contraceptive coverage to Notre Dame's students and staff. The university is permitted to opt out of providing federally mandated contraceptive services, and the federal government determines (enlists, drafts, conscripts) substitute providers, and it is not surprising that they are the providers

who already are providing health services to university students and staff.

The university argues that by conditioning its right not to provide contraceptive coverage for its students and staff on its signing EBSA Form 700 and giving copies to Aetna and Meritain, the government has, in violation of RFRA, "substantially burden[ed] a person's exercise of religion" (the university is a nonprofit corporate "person"; cf. 1 U.S.C. § 1; *Korte v. Sebelius*, 735 F.3d 654, 674 (7th Cir. 2013)), and that no "compelling governmental interest" justifies that burdening. It notes that the Catholic concept of "scandal" forbids the encouragement (equivalent to aiding and abetting) of sinful acts; a 2013 affidavit by Notre Dame's executive vice-president defines "'scandal' … in the theological context … as encouraging by words or example other persons to engage in wrongdoing." Of course in invoking the exemption the university also throws the entire administrative and financial burden of providing contraception on the health insurer and third-party administrator, which are secular organizations that unlike the university have no aversion to providing contraceptive coverage. The result is to lift a burden from the university's shoulders.

Alternatively Notre Dame charges that the government has "coerce[d] [it] into serving as the crucial link between contraceptive providers and recipients." That's a recursion to the "conduit" theory, and ignores that as a result of the university's signing the exemption form, students and staff now deal directly with Aetna and Meritain, bypassing Notre Dame. It is federal law, rather than the religious organization's signing and mailing the form, that requires health-care insurers, along with third-party administrators of self-

insured health plans, to cover contraceptive services. By re-fusing to fill out the form Notre Dame would subject itself to penalties, but Aetna and Meritain would still be required to provide the services to the university's students and em-ployees.

Notre Dame says no—that had it not filled out the form, Meritain wouldn't have been *authorized* to provide contra-ceptive services because it would have been a "plan admin-istrator" under section 3(16) of ERISA, 29 U.S.C. § 1002(16), and thus not a plan fiduciary entitled to make expenditures (as for contraception coverage) on behalf of the plan. The university argues that it alone is authorized to designate a plan fiduciary, 29 U.S.C. § 1102(a)(2), and that it made that designation in the form that it mailed to the company and thus is complicit in the provision of contraceptives to the university's staff. This version of Notre Dame's "triggering" argument does not apply to Aetna, which is the students' health insurer and so already a plan fiduciary, 29 U.S.C. § 1002(21)(A), required therefore by the Affordable Care Act to provide contraceptive coverage to plan members whether or not Notre Dame signs the form. 45 C.F.R. §§ 147. 130(a)(1)(iv), 147.131(f). Even as to Meritain, although "many agreements between third party administrators and plan sponsors prohibit third party administrators from serving as fiduciaries," "Coverage of Certain Preventive Services Un-der the Affordable Care Act," *supra*, 78 Fed. Reg. at 39879, "many" is not "all" or even "most." Notre Dame has pre-sented no evidence that its contract with Meritain forbids the latter to be a plan fiduciary (remember that the contract is not in the record).

Nor has the university been ordered to name Meritain as a plan fiduciary. Rather, the signed form "*shall be treated as* a designation of the third party administrator as the plan administrator under section 3(16) of ERISA for any contraceptive services required to be covered." 29 C.F.R. § 2510.3-16(b) (emphasis added). Treated and designated by whom? By the government. The delivery of a copy of the form to Meritain reminds it of an obligation that the *law*, not the university, imposes on it—the obligation to pick up the ball if Notre Dame decides, as is its right, to drop it. Notre Dame's signing the form no more "triggers" Meritain's obligation to provide contraceptive services than a tortfeasor's declaring bankruptcy "triggers" his co-tortfeasors' joint and several liability for damages. Meritain must provide the services no matter what; signing the form simply shifts the financial burden from the university to the government, as desired by the university.

Suppose the United States, like the United Kingdom, Canada, and many other foreign nations, had a "single payer" health care system. In such a system, the government pays the cost of specified medical services (if the United States had such a system, it would be the equivalent of Medicare for everyone), rather than employers, health insurers, and patients, though patients may be charged directly for some of the expense of the medical care provided by the system, as distinct from indirectly through taxes. If our hypothetical single-payer system paid the full expense of female contraceptives, Notre Dame couldn't argue that the system placed a "substantial burden" on the university's compliance with Catholic doctrine, for Notre Dame does not deny the existence of the legitimate secular interests noted at the outset of this opinion that justify a federal program of pay-

ing for contraceptive expenses. (For a summary of those interests, see "Coverage of Certain Preventive Services Under the Affordable Care Act," *supra*, 78 Fed. Reg. at 39872–73.) It even advised the district court that to "achieve its asserted interests without forcing Notre Dame to violate its religious beliefs" the government could "directly provide contraceptive[s]" to the university's staff and students or, alternatively, "directly offer insurance coverage for contraceptive services." The consequence in either case would be a single-payer system for contraceptives. The main difference between such a system and the Affordable Care Act is that under the Act the government, instead of providing medical services directly, uses private insurance providers and health plan administrators as its agents to provide medical services subsidized by the government.

If the government is entitled to require that female contraceptives be provided to women free of charge, it is unclear how signing the form that declares Notre Dame's authorized refusal to pay for contraceptives for its students or staff, and its mailing the authorization document to those companies, which under federal law are obligated to pick up the tab, could be thought to "trigger" the provision of contraceptive coverage.

But we must—we have been ordered by the Supreme Court to—consider the bearing on our analysis of *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014). The case (anticipated by our decision in *Korte v. Sebelius*, *supra*) involved three closely held for-profit corporations whose owners objected on religious grounds to having (by virtue of the contraception provisions of the Affordable Care Act and the regulations issued under it) to provide insurance coverage

for their employees' purchase of contraceptives that can destroy a fertilized ovum, such as "morning after" pills and intrauterine contraceptive devices (IUDs); the owners' objections were thus objections not to contraceptives as such but to what they considered to be abortifacients. The question was whether RFRA should be interpreted to apply to nonreligious institutions owned by persons having sincere religious objections to their institutions' having to comply with the ACA's contraceptive regulations. The Court held that it should be so interpreted, and therefore the institutions would be entitled to the "accommodation," that is, to fill out form FSBA 700 and mail it to their health insurers: "HHS has already established an accommodation for nonprofit organizations with religious objections. Under that accommodation, the organization can self-certify that it opposes providing coverage for particular contraceptive services. If the organization makes such a certification, the organization's insurance issuer or third-party administrator must '[e]xpressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan' and '[p]rovide separate payments for any contraceptive services required to be covered' without imposing 'any cost-sharing requirements … on the eligible organization, the group health plan, or plan participants or beneficiaries.'" 134 S. Ct. at 2782 (citations and cross-reference omitted). This of course is what Notre Dame did in our case; the companies in the *Hobby Lobby* case did it without protesting—which shows how different the two cases are. The companies in Hobby Lobby *requested* the accommodation; Justice Kennedy, concurring in *Hobby Lobby*, described the accommodation as an "existing, recognized, workable, and already implemented framework to provide coverage" for employees of

"an objecting employer." 134 S. Ct. at 2786. Notre Dame, in contrast, deems the accommodation a violation of its religious rights.

The Supreme Court did leave open in *Hobby Lobby* the possibility that the accommodation sought and obtained there would not prevent religious beliefs or practices from being substantially burdened in some cases. But it gave no examples; perhaps it remanded our case for further consideration of that possibility. We've suggested in this opinion that Notre Dame could as an alternative to the official accommodation direct Meritain to delegate to companies that have no contractual relationship with Notre Dame (as Aetna and Meritain do) the provision of contraception coverage to the university's students and staff. Then Notre Dame would be outside the loop.

Notre Dame does note possible alternatives, such as a single-payer system in which Notre Dame women would apply directly to the government for reimbursement of their costs of buying contraceptives. But at this stage in the litigation, with no trial having been conducted, we have no basis for concluding that any of the university's proposed alternatives would avoid imposing an unreasonable cost either on the government or on Notre Dame's students and employees. The government, as we said, typically provides medical services, including reimbursement of costs incurred by medical providers, indirectly, through health insurance companies such as Aetna. Does Notre Dame expect the government to establish a federal contraception agency to which Notre Dame women should send the bills for the contraceptives they buy? Alternatively, must every woman who wants reimbursement of contraceptive costs pick a health insurance

company, maybe on the basis of a Google search, to contract with? This seem to be what the university has in mind when it says in its position statement that it has no "objection to a system in which its employees or students coordinated with an *independent* insurer to provide coverage that 'would not involve Notre Dame'" (emphasis in original). But because it's a bother for a person to shop for the "best" contraceptive coverage, the proposed solution would reduce the number of women with such coverage, compared to their being entitled to such coverage automatically by virtue of being Notre Dame students or employees. See Brigitte C. Madrian & Dennis F. Shea, "The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior," 116 *Quarterly Journal of Economics* 1149 (2001), comparing employee participation in employer-sponsored savings plans under "opt-in" and "opt-out" enrollment and finding that there is much greater participation when one has to opt out in order to forgo it.

The Supreme Court pertinently observed in its *Hobby Lobby* opinion that the official accommodation (the accommodation that Notre Dame wants to escape from) would not impede "women's receipt of benefits by requiring them to take steps to learn about, and to sign up for, a new government funded and administered health benefit." 134 S. Ct. at 2783. So far as we can tell from an undeveloped record, the alternatives suggested by Notre Dame would impede the receipt of such benefits.

Notre Dame says in its position statement that the government has "*many* alternative ways of providing free contraceptive coverage without using the health plans of objecting religious non-profits as the conduit" (emphasis added). Put to one side the question in what sense students and staff

dealing directly as they now do with Aetna and Meritain are "using" Notre Dame's health plans—plans that exclude contraception coverage. Our present concern is that Notre Dame has thus far failed to explain the "many alternative ways" (elsewhere it refers to "the myriad ways" or "any number of ways" in which the government can provide free contraceptive coverage to Notre Dame's students and staff)—and it admits that it (that is, Notre Dame) "opposes many of these alternatives on policy grounds."

It lists the following "myriad ways": The government could

(i)      directly provide contraceptive services to the few individuals who do not receive it under their health plans;

(ii)     offer grants to entities that already provide contraceptive services at free or subsidized rates and/or work with these entities to expand delivery of the services;

(iii)    directly offer insurance coverage for contraceptive services;

(iv)     grant tax credits or deductions to women who purchase contraceptive services; or

(v)      allow Notre Dame and other Catholic non-profit organizations to comply with the Mandate [what we are calling the accommodation or official accommodation] by providing coverage for methods of family planning consistent with Catholic beliefs (i.e., Natural Family Planning training and materials).

Number v is not contraception at all; iv elides all consideration of the costs and complications of the administrative machinery for providing tax incentives to consumers; options i through iii similarly would involve cumbersome administrative machinery and at the same time impose a bur-

den on Notre Dame's female students and employees who want to obtain contraceptives.

Nor does Notre Dame explain how a government program that directly or indirectly provided contraception coverage to Notre Dame employees—as Notre Dame suggests—would avoid complicity in sin. Were Notre Dame to hire an unemployed person who, by virtue of becoming employed by Notre Dame, obtained contraception coverage for the first time, would not the university be "triggering" the new employee's access to contraception?

We point out, finally, that a religious institution does not have to sign FSBA 700 in order to exempt itself from the requirement of providing contraceptive coverage to employees and (if the institution is a college or university) students. It can in the alternative notify the Department of Health and Human Services. That was the alternative chosen by another institution of higher learning that was unwilling to provide contraceptive coverage or even sign the FSBA 700. In *Wheaton College v. Burwell*, 134 S. Ct. 2806 (2014) (per curiam), the Supreme Court said that "if the applicant informs the Secretary of Health and Human Services in writing that it is a nonprofit organization that holds itself out as religious and has religious objections to providing coverage for contraceptive services, the respondents are enjoined from enforcing against the applicant the challenged provisions of the Patient Protection and Affordable Care Act and related regulations pending final disposition of appellate review. To meet the condition for injunction pending appeal, the applicant need not use the form prescribed by the Government, EBSA Form 700, and need not send copies to health insurance issuers or third-party administrators." We assume that

Notre Dame could ask Aetna and Meritain to ignore its submission to them of the signed FSBA 700, and instead could itself inform the Secretary of Health and Human Services of its desire to be exempt on religious grounds from providing contraceptive coverage; undoubtedly the Secretary would agree.

Notre Dame tells us that it likewise objects to that alternative. But based on the sparse record before us, there is a strong argument that given the government's legitimate interest in the provision of contraceptive coverage to women without cost to them, notice to the government would strike the proper balance between legitimate governmental and sincere religious interests. That was the accommodation sought and received by Wheaton College.

We are put in mind of *Bowen v. Roy*, 476 U.S. 693 (1986). Roy objected that any use of his daughter's Social Security number would substantially burden his religious beliefs because he believed that use of that unique identifier would harm her spirit. He wanted an accommodation that would relieve him of the burden of providing the number in his applications for welfare and food stamps and prevent the government from using the number in its internal administration. The Supreme Court refused. It said that "Roy may no more prevail on his religious objection to the Government's use of a Social Security number for his daughter than he could on a sincere religious objection to the size or color of the Government's filing cabinets." *Id*. at 700. The very word "accommodation" implies a balance of competing interests; and when we compare the burden on the government or third parties of having to establish some entirely new method of providing contraceptive coverage with the

burden on Notre Dame of simply notifying the government that the ball is now in the government's court, we cannot conclude that Notre Dame has yet established its right to the injunctive relief that it is seeking before trial. The mandate to cover contraceptive care as part of any broad health insurance package provided by employers (or in the case of educational institutions, students as well) was intended to minimize financial, administrative, and logistical obstacles to such coverage. See 78 Fed. Reg. 39888 (July 2, 2013), rejecting alternative proposals and explaining the importance of minimizing costs and logistical and administrative obstacles to contraceptive coverage; see also *Priests for Life v. U.S. Dept. of Health & Human Services*, *supra*, 772 F.3d at 265. All of Notre Dame's suggested alternatives would impose significant financial, administrative, and logistical obstacles by requiring women to sign up for separate coverage either with a government agency or with another private insurer. Such obstacles were considered by the Supreme Court in *Hobby Lobby* in support of the same accommodation that Notre Dame refuses to accept.

We emphasize in closing the tentative character of the analysis in this opinion. The record is insufficiently developed to enable us to rule definitively on Notre Dame's claims. The burden of establishing an entitlement to a preliminary injunction was of course on the university, not on the government. The burden has not been carried. Chief Judge Simon's denial of preliminary relief is therefore once again

AFFIRMED.

HAMILTON, *Circuit Judge*, concurring. I join Judge Posner's opinion in full. Notre Dame is not entitled to preliminary injunctive relief at this point. While the ultimate decision on the merits of this case remains uncertain, equitable considerations weigh against a grant of a preliminary injunction now. An injunction would disrupt the status quo and temporarily cut off contraceptive coverage for hundreds or thousands of women.

What this case needs now is a trial on the merits where the relevant factual issues can be explored in depth. The limited factual record before us was made in the district court on an emergency basis in December 2013. That record was also made without the participation of the intervenors, who would be affected most directly by the injunction Notre Dame seeks. Since that time, also, the legal and factual landscapes shaping the issues have shifted a good deal.

Where the law is evolving rapidly and the facts are complex, the better course is usually full exploration of the evidence and thorough findings of fact by the district court, rather than reliance on sweeping legal doctrines and hypothesized or assumed facts. See *Lalonde v. Textron, Inc.*, 369 F.3d 1, 6 (1st Cir. 2004) (vacating in part dismissal of ERISA case challenging actions of employee stock ownership plan and allowing for factual development where law was "neither mature nor uniform"); *Doe v. Walker*, 193 F.3d 42, 46 (1st Cir. 1999) (Boudin, J.) (vacating dismissal on issue with "important social and moral implications" where further factual development might make it unnecessary to decide hard case and in any event would be "likely to contribute to a more sensitive assessment of what the law 'is' (which, absent deci-

sive precedent, means what it 'should be')"); *Nelson v. IPALCO Enterprises, Inc.*, 2005 WL 1924332, at *3 (S.D. Ind. Aug. 11, 2005) (denying cross-motions for summary judgment to allow further factual development where applicable law was "emerging, controversial, and highly fact-sensitive"). The district court is best suited for those responsibilities even where—and perhaps especially where—the appellate courts are still debating the applicable law.

For now, however, the Supreme Court has ordered us to reconsider our earlier interlocutory decision in light of *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. —, 134 S. Ct. 2751 (2014). The accommodation for religious not-for-profits like Notre Dame played a pivotal role in *Hobby Lobby*, but not in a way that helps Notre Dame in this case. Hobby Lobby Stores is a for-profit corporation that was not eligible for this accommodation. The very existence of the accommodation for religious not-for-profits, however, persuaded the Supreme Court that the government could achieve its purpose of making contraceptives available to employees and their families without infringing on Hobby Lobby's religious beliefs. 134 S. Ct. at 2782.

The Court's conclusion focused on how the accommodation allowed the employer to avoid paying for contraceptives contrary to the owners' religious beliefs while still making them available to employees and their families in a convenient and seamless way. In praising the accommodation, the Court explained that the effect of the accommodation on employees "would be precisely zero. Under that accommodation, these women would still be entitled to all FDA-approved contraceptives without cost sharing." 134 S. Ct. at 2760. Justice Kennedy's concurring opinion embraced the

accommodation as a fully satisfactory alternative for accomplishing the government's objectives without infringing on Hobby Lobby's religious beliefs. 134 S. Ct. at 2786–87 (Kennedy, J., concurring). He also made clear that neither he nor the other Justices in the majority expected the government to create "a whole new program or burden on the Government" to provide the accommodation needed by the for-profit employer-plaintiffs. *Id*.

The accommodation for religious not-for-profits thus made it fairly easy for the *Hobby Lobby* Court to find that a less restrictive and equally effective alternative was available to accomplish the government's purposes, which the Court assumed were compelling. The Court's solution was to extend the accommodation to religious owners of closely held businesses.

What does *Hobby Lobby* teach us about this case? In deciding *Hobby Lobby*, the Supreme Court was well aware of pending lawsuits like this one, in which religious not-for-profits have challenged the accommodation itself as violating their rights under the Religious Freedom Restoration Act. The majority opinion referred to this category of cases in footnote 9 and wrote later "We do not decide today whether an approach of this type [i.e., the accommodation] complies with RFRA for purposes of all religious claims." 134 S. Ct. at 2782 & n.40.

Despite this inconclusive comment, it is useful to consider in turn the three principal issues under RFRA in light of the Court's remand order after *Hobby Lobby*. Those issues are: (1) "substantial burden" on the exercise of religion; (2) compelling governmental interests; and (3) less restrictive alternatives.

1. *Substantial Burden*:  Notre Dame reads *Hobby Lobby* as resolving conclusively in its favor the issue whether the accommodation substantially burdens its exercise of its religion. In *Hobby Lobby*, the Court found that the Affordable Care Act's requirements for contraceptive coverage by for-profit employers substantially burdened the plaintiffs' exercise of religion. The employers were required by law to contract and pay for contraceptive coverage to which the employers' owners objected on sincere religious grounds. The alternatives to compliance would have imposed stiff financial consequences, which the Court deemed a substantial burden. 134 S. Ct. at 2776–77. Notre Dame faces essentially the same financial consequences if it refuses to certify its eligibility for the religious accommodation.

Notre Dame finds most helpful to its position the *Hobby Lobby* rejection of the government's argument that the role of the employer in contracting and paying for contraceptive coverage was too remote from an employee's use of contraceptives to impose a substantial burden on the exercise of religion. Federal courts had no business addressing whether the plaintiffs' religious beliefs about their moral complicity were reasonable. *Id*. at 2778. The Court explained:

> This belief implicates a difficult and important question of religion and moral philosophy, namely, the circumstances under which it is wrong for a person to perform an act that is innocent in itself but that has the effect of enabling or facilitating the commission of an immoral act by another. Arrogating the authority to provide a binding national answer to this religious and philosophical question, HHS and

> the principal dissent in effect tell the plaintiffs that their beliefs are flawed. For good reason, we have repeatedly refused to take such a step.

134 S. Ct. at 2778 (footnote omitted).

The accommodation for religious not-for-profits accepts an employer's religious beliefs and provides a mechanism to provide coverage to employees and their families, while making sure that the employer need not contract, arrange, pay, or refer for the health care it finds objectionable on religious grounds. Notre Dame asserts, however, that the mere act of requesting the exemption substantially burdens its religious exercise because it still has an attenuated role in causing its employees and students to receive the objectionable coverage. Citing *Hobby Lobby*, Notre Dame asserts that its opinion or belief is beyond the reach of a federal court, apart from questions of sincerity.

It is not obvious that the reasoning of *Hobby Lobby* on the substantial burden issue extends to this case. There are important differences between the cases: Notre Dame challenges not the general rule but the accommodation itself, and it attempts to prevent the government from arranging for a substitute for the employer to pay for contraceptive care. Notre Dame also contends, in effect, that its religious belief can substitute for legal analysis regarding the operation of federal law.

Any student of United States history learns the central roles that religious faith and tolerance have played in the settlement of this land and in the founding of the British colonies and the modern States and the federal Republic. We have a long tradition of governing in ways that accommo-

date the free exercise of religion. Special treatment of religious faith and practice abounds. From conscientious objector status in the military draft to federal and state tax codes, from compulsory school attendance laws to school lunch menus, from zoning law to employment law and even fish and wildlife rules, our governments at every level have long made room for religious faith by allowing exceptions from generally applicable laws. Through such exceptions and accommodations, we respect diverse faiths, and we govern with reasonable compromises that avoid unnecessary friction between law and faith.

As we pointed out in our first opinion in this case, the most extraordinary feature of this lawsuit is Notre Dame's claim that the process of requesting the accommodation is itself a substantial burden on its religious exercise. *Notre Dame v. Sebelius*, 743 F.3d 547, 557–58 (7th Cir. 2014). True, there are rare cases in which courts have considered the possibility that an accommodation process itself might be too prolonged, intrusive, ineffective, and/or otherwise burdensome. See, e.g., *Saints Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895 (7th Cir. 2005), and cases cited there dealing with land-use decisions, and *United States v. Friday*, 525 F.3d 938 (10th Cir. 2008), and cases cited there, dealing with processes for seeking permits to kill protected wildlife for use in Native American religious practices.

The accommodation in this case, however, poses no such burdens. To take advantage of the accommodation, so that Notre Dame can avoid contracting, paying, arranging, or referring for the objectionable contraceptive care, a university official must only fill out a simple form asserting that Notre

Dame is a not-for-profit employer that objects on religious grounds to the law's contraceptive coverage requirements. The official must then send the form to either the Department of Health and Human Services or the insurer or third-party administrator. Notre Dame has already done so, and it need do nothing more.

As Judge Posner's opinion explains, *Bowen v. Roy*, 476 U.S. 693 (1986), weighs against Notre Dame's claim of a substantial burden here. Roy had objected on religious grounds to the government's use of his daughter's Social Security number to administer federal benefits for the family. The Supreme Court rejected the challenge, holding: "The Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." *Id*. at 699.

Notre Dame's position is analogous. At this point, Notre Dame has requested the accommodation and provided the government with contact information for Aetna and Meritain. The government requires no further action from Notre Dame. The government has informed Aetna and Meritain of their federal obligations to provide contraceptive coverage that Notre Dame has been exempted from providing. The government's steps to have others substitute for Notre Dame are parallel to the internal procedures at issue in *Roy*.

Notre Dame disagrees, arguing that only it can answer what it says is the religious question of whether its religious exercise is substantially burdened by the government's actions. But the Court rejected precisely that argument when it was advanced by Roy. "The Federal Government's use of a Social Security number for Little Bird of the Snow does not

itself in any degree impair Roy's 'freedom to believe, express, and exercise' his religion." 476 U.S. at 700–01.

While the Court acknowledged that "Roy's religious views may not accept this distinction between individual and governmental conduct," *id*. at 701 n.6, the Court concluded that this was ultimately a legal question, not a religious one: "It is clear, however, that the Free Exercise Clause, and the Constitution generally, recognize such a distinction; for the adjudication of a constitutional claim, the Constitution, rather than an individual's religion, must supply the frame of reference." *Id*. Under *Roy*, whether the government is causing a substantial burden on a person's religious exercise is a question of federal law. Accord, *Geneva College v. Secretary of the United States Dep't of Health and Human Services*, 778 F.3d 422, 436–38 (3rd Cir. 2015) (courts must consider substantial burden issue under RFRA); *Priests for Life v. Burwell*, 772 F.3d 229, 247–49 (D.C. Cir. 2014); *Michigan Catholic Conference v. Burwell*, 755 F.3d 372, 385–87 (6th Cir. 2014), remanded, 2015 WL 1879768 (April 27, 2015).

Notre Dame argues, however, that the consequence of its certification and exemption imposes the substantial burden. The consequence is that federal law then requires other entities (Meritain and Aetna) to step in as substitutes to provide contraceptive coverage directly to Notre Dame employees and students, respectively, and to their families. Notre Dame objects to this consequence on religious grounds and says it could avoid this consequence only by incurring burdensome financial penalties.

The problem with this argument is that regardless of Notre Dame's choice—to provide contraceptive coverage, to invoke the accommodation for religious not-for-profits, or

even not to provide any health insurance coverage at all—those employees and students would receive contraceptive coverage through some form of health insurance. As we and other circuits have pointed out, their coverage results *from federal law*, not from Notre Dame's actions.

This is an issue not of moral philosophy but of federal law. Federal courts are not required to treat Notre Dame's erroneous legal interpretation as beyond their reach—even if that interpretation is also a sincere and religious belief. Notre Dame is not entitled to nullify the law's benefits for others based on this mistake of law, which is the foundation of its claim of a substantial burden.[1]

As in *Roy*, Notre Dame's "religious views may not accept this distinction." 476 U.S. at 701 n.6. But the courts cannot substitute even the most sincere religious beliefs for legal analysis. To do so would "afford an individual a right to dictate the conduct of the Government's internal procedures," which the Court has expressly rejected. *Id*. at 700.

A comparison to the military draft helps to illustrate the extraordinary nature of Notre Dame's objection to the government's accommodation and finding of substitutes for it. Federal law allows for exemption from military training and service for any person "who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form." 50 App. U.S.C. § 456(j). (The process for claiming conscientious objector status is far more demanding than

---

[1] Accord, *Geneva College*, 778 F.3d at 437 (3rd Cir. 2015); *Priests for Life*, 772 F.3d at 252; *Michigan Catholic Conference*, 755 F.3d at 387; 78 Fed. Reg. 39870, 39876 (July 2, 2013) (final rules explaining that obligations of insurers and third-party administrators are imposed by federal law).

the accommodation to which Notre Dame objects, but that's not my focus here.) Suppose a person's religious faith leads him to believe that it is wrong for people to engage in war. He applies for conscientious objector status. The local draft board grants him the exemption.

But suppose a board member then points out that because the objector will not be drafted, someone else will be drafted in his place. He objects again, asserting, much as Notre Dame does here, that if his exemption means someone else must substitute for him to engage in wrongdoing, he will be morally responsible for it and his religious exercise will be substantially burdened. Citing RFRA, he therefore demands that he be exempted *without a substitute*.

As we said in our prior opinion, that seems a "fantastic suggestion." *Notre Dame*, 743 F.3d at 556. Yet Notre Dame has embraced that reasoning. It argues that national catastrophe could be avoided by treating the substitute draftee as the least restrictive means to achieve a compelling governmental purpose. See Notre Dame Rule 54 Statement at 11 n.4. This seems wrong in two fundamental ways.

First, for reasons explained above, the arrangements the government makes to find substitutes for those given the benefit of a religious exemption are imposed as a matter of federal law, not as a result of the exemption itself. The party claiming the exemption is not entitled to raise a religious objection to the arrangements the government makes for a substitute. See *Geneva College*, 778 F.3d at 439 n.14 (making similar point with example of employee who asks for time off to accommodate his religion, but who then objects to employer's substitution for him). And not coincidentally, the government's ability to find substitutes fits well with the Su-

preme Court's decision, just a few days after it decided *Hobby Lobby*, in a RFRA case much more similar to this one. In *Wheaton College v. Burwell*, 134 S. Ct. 2806 (2014), the Court issued an interim order allowing another religious college to invoke the exemption by notifying the government rather than its insurer. The Court pointed out: "Nothing in this order precludes the Government from relying on this notice, to the extent it considers it necessary, to facilitate the provision of full contraceptive coverage under the Act." *Id*. at 2807. In other words, the Court's order allowed the government to pass the notice on to the insurer so that the insurer could comply with its obligations under federal law. That order left Wheaton College essentially where Notre Dame is now.

Second, if even such mistaken and attenuated objections were sufficient to invoke RFRA's stringent least-restrictive-means test, fair governance where the law imposes burdens on individuals would become nearly impossible. In the draft context, the conscientious objector could argue, much as Notre Dame does here, in favor of an all-volunteer military as a less restrictive means. Should arguments for such radical restructuring of government programs be sufficient under RFRA? And in contexts not involving national security and defense, would government accommodations of religion that require finding substitutes all have to satisfy compelling-interest, least-restrictive-means scrutiny?

For these reasons, RFRA should not be understood to recognize such mistaken views about substitutes as "substantial burdens" on religious belief. Accord, *Geneva College*, 778 F.3d at 438; *Priests for Life*, 772 F.3d at 251, 256; *Michigan Catholic Conference*, 755 F.3d at 388; see generally *Bowen v. Roy*, 476 U.S. at 699–700; *Kaemmerling v. Lappin*, 553 F.3d 669,

679–80 (D.C. Cir. 2008) (prisoner's religious exercise not burdened by government's analysis of DNA taken from his tissue sample).

2. *Compelling Governmental Interest*: Even if Notre Dame can ultimately show a substantial burden on its religious belief, the next major issue under RFRA is whether imposing the burden on Notre Dame furthers a "compelling governmental interest." 42 U.S.C. § 2000bb–1. In the abbreviated district court proceedings back in December 2013, the federal government did not contest this issue because of our ruling in *Korte v. Sebelius*, 735 F.3d 654 (7th Cir. 2013), though the government preserved its right to dispute the issue in the future.

*Hobby Lobby* now shows that the government has a strong argument on the compelling-interest issue. The *Hobby Lobby* majority assumed that the burden on those plaintiffs would serve a compelling governmental interest. 134 S. Ct. at 2780. Justice Kennedy's concurring opinion made clear that he viewed the governmental interests as compelling. *Id.* at 2786 ("It is important to confirm that a premise of the Court's opinion is its assumption that the HHS regulation here at issue furthers a legitimate and compelling interest in the health of female employees."). And all four dissenting Justices viewed the government interests as compelling. *Id.* at 2799–2801 (Ginsburg, J., dissenting). The compelling interests include women's health, the role that access to contraception plays in enabling women to participate fully and equally in society, and significant cost savings. See 78 Fed. Reg. 39870, 39873 & nn. 22, 23, & 24 (July 2, 2013) (final rules). The D.C. Circuit has explained in detail the factual

bases for the government's compelling interests. See *Priests for Life*, 772 F.3d at 257–64.

3.  *Least Restrictive Means*: If the RFRA analysis proceeds to whether the accommodation for religious not-for-profits like Notre Dame is the least restrictive means of furthering the government's interest, the question demands much more exploration than was possible in the emergency proceedings in the district court back in December 2013.

The general mandate to cover contraceptive care as part of any broad health insurance package provided by employers was intended to minimize financial, administrative, and logistical obstacles to such coverage. 78 Fed. Reg. at 39888 (rejecting alternative proposals and explaining importance of avoiding incremental costs and minimizing logistical and administrative obstacles for contraceptive coverage); *Priests for Life*, 772 F.3d at 265. The accommodation for religious not-for-profits has also been designed to minimize those obstacles.

Notre Dame's suggested alternatives would all impose significant financial, administrative, and logistical obstacles by requiring women to sign up for separate coverage, either with a government agency or another private insurer, and to pay additional costs unless the government paid for the program. Such obstacles were specifically considered in *Hobby Lobby*. In debating whether the accommodation would suffice for the for-profit employers, the majority and dissent paid close attention to cost and to administrative and logistical obstacles. See 134 S. Ct. at 2782–83 (under the accommodation, plaintiffs' employees would continue to receive contraceptive coverage without cost sharing and with "minimal logistical and administrative obstacles"); *id*. at 2802 (Gins-

burg, J., dissenting) (new government program as substitute would impose obstacles to effective coverage). Those concerns about effectiveness of alternatives seem to have substantial merit. They deserve exploration in the district court.

The least-restrictive-means issue also presents a question of law for which the contours are not yet well-defined. The legal question is in essence the scope of imagination permitted in thinking of supposedly less restrictive means.

The heart of the Affordable Care Act was a decision to approach universal health insurance by expanding the employer-based system of private health insurance that had evolved in our country, rather than to substitute a new "single payer" government program to pay for health care, like the systems in place in the United Kingdom and Canada. I do not see support for Notre Dame's view that a least-restrictive-means analysis would need to consider such radically different alternatives.

In fact, Justice Kennedy's *Hobby Lobby* concurrence emphasized that the accommodation for religious not-for-profits was an "existing, recognized, workable, and already-implemented framework to provide coverage" for employees with an objecting employer. 134 S. Ct. at 2786 (Kennedy, J., concurring). In finding that the accommodation was a less restrictive alternative, Justice Kennedy noted that "the Government has not met its burden of showing that it cannot accommodate the plaintiffs' similar religious objections under this *established framework*." *Id*. (emphasis added). He also commented that accommodation was possible "without imposition of a whole new program or burden on the Government." *Id*.

Consistent with those observations, I doubt that a hypothetical new single-payer program for contraceptives, which would require separate registration or application, would be for RFRA purposes a "less restrictive" means of achieving the government's interests. It also seems likely that such a program would impose the sort of logistical and administrative obstacles of such concern in *Hobby Lobby*.

Further fact-finding in the district court may cast the case in a different light, of course. But for all of these reasons, as well as those explained in Judge Posner's opinion, I continue to agree that Chief Judge Simon properly denied a preliminary injunction in this case.

FLAUM, *Circuit Judge*, dissenting.

By requiring health insurers to provide contraceptive coverage, the Patient Protection and Affordable Care Act ("ACA") forces Notre Dame to act in ways it says violate its religious beliefs. The resultant burden on Notre Dame's rights is substantial: because Notre Dame offers health insurance to its students, and especially because it acts as a self-insurer for its employees, the law turns Notre Dame into a conduit for the provision of cost-free contraception. It also compels Notre Dame to contract with parties—Meritain and Aetna—in a manner in which Notre Dame believes makes it complicit in moral wrong. Notre Dame's only alternative is to endure crippling fines.

In light of the Supreme Court's ruling in *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014)—the decision the Court cited in asking us to reconsider this case—Notre Dame has articulated a substantial burden for purposes of the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq*. As a result, strict scrutiny governs our consideration of Notre Dame's challenge here, and the government has the burden of demonstrating that the challenged accommodation is the least restrictive means of serving a compelling interest. In my view, the government has not satisfied that charge. Accordingly, I respectfully dissent, concluding that Notre Dame is entitled to a preliminary injunction pending the district court's decision of this case on the merits.

*        *        *

The Catholic Church—like all religious employers—is exempt from the ACA's contraceptive mandate. *See Hobby Lobby*, 134 S. Ct. at 2763. The U.S. Department of Health & Human Services excluded churches and religious orders from its edict, permitting them to offer employee health insurance that does not include coverage for contraception. Notre Dame seeks that same treatment, because it has the same religious objections to rendering available contraceptive health coverage for those it employs (and those that attend its school, in Notre Dame's case). At present, Notre Dame—as a nonprofit religious organization that opposes providing contraceptive coverage—may avail itself of what has become commonly referred to as "the accommodation," *see e.g.*, 45 C.F.R. § 147.131(b), the effects of which Notre Dame says also violate its religious beliefs.

Notre Dame has two distinct roles as far as health insurance is concerned. With respect to its employees, Notre Dame acts as a self-insurer (hiring Meritain as the third-party administrator of its insurance plan). For its students, Notre Dame acts as an insurance broker (negotiating on their behalf to offer them an insurance plan through insurer Aetna). When Notre Dame invoked the accommodation, its relationship with both Meritain and Aetna changed because of the ACA. Meritain, its third-party administrator, became both authorized and required to offer contraceptive coverage to Notre Dame's employees. *See Wheaton Coll. v. Burwell*, 134 S. Ct. 2806, 2814 n.6 (2014) (Sotomayor, J., dissenting) (noting that a religious university's "third-party administrator bears the legal obligation to provide contraceptive coverage *only* upon receipt of a valid self-certification" (emphasis add-

ed)). Aetna, as the insurer for the student plans, became obligated to segregate premium payments from Notre Dame's students and to provide them with contraceptive coverage at Aetna's expense, separate and apart from the insurance plan offered by the school. *See Hobby Lobby*, 134 S. Ct. at 2763 ("When a group-health-insurance issuer receives notice that one of its clients has invoked this provision, the issuer must then exclude contraceptive coverage from the employer's plan and provide separate payments for contraceptive services for plan participants without imposing any cost-sharing requirements on the eligible organization, its insurance plan, or its employees beneficiaries."(citing 45 C.F.R. § 147.131(c)).

While Notre Dame is no longer obligated to *pay* for contraceptive services for its employees, it's apparent to me that, at a minimum, the ACA thrusts Notre Dame into a facilitator's role that, Notre Dame says, violates its religious beliefs by forcing it to serve as a continuing link between Meritain and the contraceptive services it provides to Notre Dame's employees.

With regard to the student health plan, there seems to be outstanding disagreement over whether Notre Dame's invocation of the accommodation "triggers" Aetna's obligation to cover student contraception. *See Wheaton Coll.*, 134 S. Ct. at 2807 (majority opinion) ("The Government contends that the applicant's health insurance issuer … [is] required by federal law to provide full contraceptive coverage regardless [of] whether the applicant" invokes the accommodation, while Wheaton College "contends, by contrast, that the obligations of its health insurance issuer … are dependent on their receipt of notice that the

applicant objects to the contraceptive coverage require-
ment."). *But see* 42 U.S.C. § 300gg–13(a) ("A group health
plan and a health insurance issuer offering group or in-
dividual health insurance coverage shall, at a minimum
provide coverage for and shall not impose any cost shar-
ing requirements for— … (4) with respect to women,
such additional preventive care and screenings … as
provided for in comprehensive guidelines supported by
the Health Resources and Services Administration … .").
But that question really is of no moment here, because
Notre Dame also believes that being driven into an ongo-
ing contractual relationship with an insurer—especially
one that Notre Dame chose—that provides its students
with contraception compels it to act in contravention of
its beliefs.

In Notre Dame's view, the ACA alters its relationships
with both Meritain and Aetna in a way that renders
Notre Dame morally complicit in the provision of contra-
ception. Put simply, Notre Dame is too engaged in a pro-
cess—the very premise of which offends its religion—
that the church itself is exempted from entirely.

The majority appears to minimize the significance of
Notre Dame's position by focusing on its continued ob-
jection to the mandate in the face of a proffered accom-
modation. I believe that any inquiry into the rationality
of that position is precluded by the Supreme Court's de-
cision in *Hobby Lobby*, which in my view underscores the
legitimacy of Notre Dame's religious objection. There, as
here, HHS's main argument was "basically that the con-
nection between what the objecting parties must do …
and the end that they find to be morally wrong … [was]

simply too attenuated." 134 S. Ct. at 2777. However, the Supreme Court made clear that this position, at least in this narrow context, is untenable. That's because it "dodges the question that RFRA presents (whether the HHS mandate imposes a substantial burden on the ability of the objecting parties to conduct business in accordance with *their religious beliefs*) and instead addresses a very different question that the federal courts have no business addressing (whether the religious belief asserted in a RFRA case is reasonable)." *Id.* at 2778 (emphasis in original).

Like the plaintiffs' challenge in *Hobby Lobby*, Notre Dame's deeply held religious beliefs about contraception and the formation and prevention of human life "implicate[] a difficult and important question of religion and moral philosophy, namely, the circumstances under which it is wrong for a person to perform an act that is innocent in itself but that has the effect of enabling or facilitating the commission of an immoral act by another." *Id.* Notre Dame is no doubt differently situated than the *Hobby Lobby* plaintiffs, who had to directly provide contraceptive insurance. Nevertheless, the ACA also places Notre Dame in a position that contravenes its belief system. Yet the majority here sides with HHS, and "in effect tell[s] the plaintiff[] that [its] beliefs are flawed."[1] *Id.* The

---

[1] To the extent the majority views Notre Dame's burden as less substantial than the burden imposed on the plaintiffs in *Hobby Lobby* (and thus not actionable under RFRA) because Notre Dame is further removed from the direct provision of contraception, I suggest that analysis is flawed. *Hobby Lobby* instructs that, once we determine a religious belief is burdened, substantiality is measured by the se-

*Hobby Lobby* Court, however, rejected that position. *See id.*
("Repeatedly and in many different contexts, we have
warned that courts must not presume to determine … the
plausibility of a religious claim." (quoting *Emp't Div.,
Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 887
(1990))). And so do I.

For that reason, the *Hobby Lobby* Court had "little
trouble concluding" that "the HHS contraceptive man-
date 'substantially burden[ed]' the exercise of religion" in
view of the plaintiffs' asserted beliefs.[2] *Id.* at 2775. The
Court thus proceeded to the compelling interest compo-
nent of the RFRA test. *See id.* at 2779 ("Since the HHS con-

---

verity of the penalties for non-compliance. 134 S. Ct. at 2759, 2775–
76. Because the contraceptive mandate forced the *Hobby Lobby* plain-
tiffs "to pay an enormous sum of money ... if they insist[ed] on
providing insurance coverage in accordance with their religious be-
liefs, the mandate clearly impose[d] a substantial burden on those
beliefs." *Id.* at 2779. Here, Notre Dame faces the same penalties the
*Hobby Lobby* plaintiffs faced: $100 per day for each affected individu-
al. 42 U.S.C. § 300gg-22(b)(2)(C). "These sums are surely substan-
tial." *Hobby Lobby*, 134 S. Ct. at 2776.

[2] I would be remiss not to note that just one week after the Supreme
Court issued its opinion in *Hobby Lobby*, Wheaton College—which,
on the basis of our first (and now vacated) decision in this case was
denied a preliminary injunction in its own Seventh Circuit suit chal-
lenging the contraceptive mandate's accommodation provision—
sought and was granted emergency relief by the Supreme Court.
*Wheaton Coll.*, 134 S. Ct. at 2807. In granting the preliminary injunc-
tion, the Court necessarily found (at least for preliminary injunctive
purposes) that the accommodation substantially burdened Wheaton
College. Notre Dame challenges that same (though slightly revised)
accommodation.

traceptive mandate imposes a substantial burden on the exercise of religion, we must move on and decide whether HHS has shown that the mandate both '(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.' 42 U.S.C. § 2000bb–1(b)."). In *Hobby Lobby*, "HHS assert[ed] that the contraceptive mandate serves a variety of important interests, but many of these [were] couched in very broad terms, such as promoting 'public health' and 'gender equality.'" *Id.* HHS asserted those same interests to the district court in this case. *See* Defs.' Resp. in Opp'n to Pl.'s Mot. for Prelim. Inj. at 15–16, *Notre Dame v. Sebelius*, 988 F. Supp. 2d 912 (N.D. Ind. 2013) (No. 3:13-cv-01276) ("[E]ven if the challenged regulations were deemed to impose a substantial burden on plaintiff's religious exercise, the regulations satisfy strict scrutiny because they are narrowly tailored to serve compelling government interests in *public health* and *gender inequality*." (emphases added)). The Supreme Court, however, rejected the simple assertion of such broad interests.

"RFRA … contemplates a 'more focused' inquiry: It 'requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened.'" *Hobby Lobby*, 134 S. Ct. at 2779 (quoting *Gonzales v. O Centro Espírita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006)). "This requires us to 'loo[k] beyond broadly formulated interests' and to 'scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants … .'" *Id.* (quoting *O Centro*, 546

U.S. at 431). Nevertheless, the Court found it unnecessary to delve into the "features of [the] ACA that support [the] view" that the government lacks a compelling interest here (such as the fact that "many employees—those covered by grandfathered plans and those who work for employers with fewer than 50 employees—may have no contraceptive coverage without cost sharing at all"), because—even assuming that the government's interest is a compelling one—HHS failed to demonstrate "that the contraceptive mandate is 'the least restrictive means of furthering'" it. *Id.* at 2780 (citing § 2000bb–1(b)(2)).

As the Court noted, "[t]he least-restrictive-means standard is exceptionally demanding," and it is the government's burden to demonstrate that "it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y]." *Id.* Here again, the majority in our case sets aside *Hobby Lobby*, instead assigning Notre Dame this burden because it seeks a preliminary injunction. But Hobby Lobby, too, sought a preliminary injunction. *Hobby Lobby Stores Inc. v. Sebelius*, 723 F.3d 1114, 1143 (10th Cir. 2013) ("[E]ven at the preliminary injunction stage, RFRA requires *the government* to demonstrate that mandating a plaintiff's compliance with the contraceptive-coverage requirement is 'the least restrictive means of advancing a compelling interest.'" (emphasis in original) (citing *O Centro*, 546 U.S. at 423)), *aff'd*, 134 S. Ct. 2751. And the law in our own circuit is clear on this point. *See Korte v. Sebelius*, 735 F.3d 654, 673 (7th Cir. 2013) (noting, in the preliminary injunction context, that "[o]nce a RFRA claimant makes a prima facie case that the application of a law or regulation substantially burdens his reli-

gious practice, the burden shifts to the government to jus-
tify the burden under strict scrutiny"). Indeed, the gov-
ernment—in this very case—conceded in its brief to the
district court that *Korte* dictates the issuance of a prelimi-
nary injunction if the court finds a substantial burden on
Notre Dame's religious beliefs. *See* Defs.' Resp. in Opp'n
to Pl.'s Mot. for Prelim. Inj., *supra*, at 15–16 ("Defendants
recognize that a majority of the Seventh Circuit rejected
these arguments [that the regulations satisfy strict scruti-
ny because they are narrowly tailored to serve compel-
ling governmental interests in public health and gender
equality] in *Korte*, and that this Court is bound by that
decision."). In *Korte*, we granted the preliminary injunc-
tion because the government had made minimal efforts
"to explain how the contraception mandate is the least
restrictive means of furthering its stated goals of promot-
ing public health and gender equality." 735 F.3d at 687.
*Korte*, of course, was our iteration of *Hobby Lobby*, and it
remains the law of this circuit—yet it appears not to in-
struct the majority.

The majority observes that Notre Dame has presented
"possible alternatives" to the accommodation that would
not infringe its religious exercise. Yet it concludes that
Notre Dame has failed to present an adequate proposal
for how the government can efficiently (and convenient-
ly) implement and administer an alternative program.
But to reiterate, *Hobby Lobby* expressly informs—
consistent with *Korte*—that it is the government's, not
Notre Dame's, burden to establish that the accommoda-
tion is the least restrictive means of advancing a compel-
ling government interest. Moreover, the suggestion by
the majority that any alternative method of advancing

the government's interests would likely be too costly or cumbersome to the government turns a blind eye to the Supreme Court's latest teachings. What matters under RFRA is whether the means by which the government is attempting to advance its compelling interest is the least burdensome on Notre Dame's religious beliefs. Accordingly, RFRA may require the government to start over and "creat[e] … entirely new programs," and it "may in some circumstances require the Government to expend additional funds to accommodate citizens' religious beliefs." *Hobby Lobby*, 134 S. Ct. at 2781. For those reasons, the Supreme Court made clear that, in this sphere, "[t]he most straightforward way" of serving the Government's interests would be for it to assume the cost of providing contraception "to any women who are unable to obtain them under their health-insurance policies due to their employers' religious objections." *Id.* at 2780. Here, as in *Hobby Lobby*, "HHS has not shown … that this is not a viable alternative." *Id.* For that reason, I would reverse the decision of the district court denying Notre Dame a preliminary injunction.